The Centennial Mutual Life Association v. J. R. Parham.

No. 6641.

1. Notice—Estoppel.—The beneficiary of an insurance policy on the life of his wife can not be heard to say that he was ignorant of the contents of the policy at any time after he received it.

2. Agency—Acts of Wife in Obtaining Insurance Policy.—The policy was applied for by the wife with consent of her husband. It was for his benefit; he paid the premiums. It would seem therefore that the wife was but the agent of the husband, although nominally a party to the contract, whose knowledge and acts ought in law to be attributed to him.

3. Insurance Agent's Collusion with Insured.—Where the pleadings and evidence in an action by an insurance company for the recovery of money paid on a policy raise the issue of fraudulent collusion between the insurance agent procuring the contract and the wife, the assured party, and her husband, the beneficiary, it was error to refuse to instruct the jury that if such fraudulent collusion existed, then the knowledge of the agent of the insurance company of the falsity of representations made by the wife, the husband at the time not knowing them, would not prevent a recovery if the policy was issued in reliance upon the truth of such representations.

4. Agent Acting in Fraud of His Principal.—When an agent ceases to act for his principal, and through collusion with another, desiring through him to defraud the principal, practically enters into the service of that other for the purpose of forwarding the interest of such other, then the relation and incidents to agency cease as to the subject of collusion between the agent and those to be benefited by it. Notice by such agent would not affect his principal in favor of his colleagues in the fraud.

5. Charge—Fraudulent Representations.—In a suit by insurance company against the husband for money received by him upon a policy upon his wife's life obtained by means of false representations as to her health and habits, the testimony showing collusion between the parties with the agent of the insurance company, the court erred in restricting the liability of the husband to a case of active participation

by him in the representations when made or in fraudulently concealing them. The wife's acts under such circumstances were binding upon him in making the representations.

6. **Insurance Contract.**—The contract is the basis of every right any person can claim under it. It provided that the policy should be inoperative in case the representations on which it was based were untrue, and not that it should be inoperative only in the event the beneficiary knew that they were untrue at the time they were made, and aided, advised, or abetted the person making them, or concealed the fact of their falsity. Courts have neither the power nor right to change the contract made by the parties and to declare a liability on a state of facts which the parties never agreed should fix it.

7. **False Representations in Obtaining Insurance Policy.** — Were this an action on the policy it would not be contended that a recovery could be had on it on the ground that the beneficiary was ignorant at any time of the existence of the facts which by its terms rendered it inoperative, for a beneficiary under or an assignee of a policy of insurance in the absence of some fact operating as an estoppel takes and holds subject to the terms of the contract itself; and if as between the immediate parties to it it is inoperative because procured by false representations, then it is inoperative to confer rights upon the beneficiary named in it.

8. **Insurance Policy Paid Under Mistake.**—An insurance company that has paid a policy obtained by fraud in ignorance of that fact is entitled to recover the sum paid. This is understood to be the rule when money is paid through want of knowledge of some fact not amounting to fraud in obtaining the policy, or fraudulent representation to obtain the money after the death occurs which might have been set up as a defense in an action on the policy.

ERROR from Taylor. Tried below before Hon. William Kennedy. The opinion states the case.

*Cockrell & Cockrell,* for plaintiff in error.—1. The declarations of an agent are not competent to prove agency, and the declarations of an agent are not binding on a principal unless same are made .by agent then acting for such principal and within the scope of his authority. Wheelock v. Wright, 38 Texas, 496; Latham v. Pledger, 11 Texas, 439; McAlpin v. Cassidy, 17 Texas, 449; Weir v. McGee, 25 Texas Supp., 221.

2. The writing evidencing the appointment of· the agent and defining his powers and duties is the best evidence of what such powers and duties are. Reese v. Medlock, 27 Texas, 120; Sims v. Chance, 7 Texas, 561; Cotton v. Campbell, 3 Texas, 493.

3. The innocence of a party who has profited by a fraud will not entitle him to retain the fruits of another's misconduct, nor will it exempt him from the duty of restitution. Able v. Chandler, 12 Texas, 88; Crayton v. Munger, 9 Texas, 285; Howpe v. Smith, 25 Texas, 448; Wright v. Calhoun, 19 Texas, 412; Bige. on Fraud, pp. 348, 367; Adams Eq., 176; 1 Story Eq., 193a.

4. It is as much a fraud to assert as truth what one does not know to be true as to assert to be true what one knows to be false. The an-

swers of the assured were warranties and vitiated the policy, whether the assured knew the falsity of the answers or not. Mitchell v. Zimmerman, 4 Texas, 75; 1 Story Eq., sec. 193; Bish. Prin. Eq., sec. 214.

5. The questions and answers of the assured, Mrs. Charles W. Parham, in her application for the policy, being made by the terms of the application and policy warranties, rendered the policy void, if untrue, whether fraudulent or not; and the plaintiff paying the amount of the policy to the defendant in error, in ignorance of the facts and under the belief that the answers, etc., were true, would be entitled to recover back the amount so paid, independently of any question of fraud on the part of the defendant or the assured. 1 Story Eq., sec. 193a; Bige. on Fraud, pp. 348, 367; Crayton v. Munger, 9 Texas, 285.

The questions and answers were warranties. May on Ins., secs. 156, 497, *et. seq.;* Insurance Co. v. Day, 29 Am. Rep., 565, and notes.

6. If plaintiff paid defendant the amount of the policy under the mistaken belief that the terms of the policy had not been violated and that the policy had not been rendered void by breach of conditions subsequent, it was entitled to recover back the amount so paid independently of the question of fraud on the part of defendant. George v. Taylor, 55 Texas, 97; Ross v. Armstrong, 25 Texas Supp., 368; 1 Story Eq., secs. 140, 141; Bige. on Fraud, pp. 348, 367; 1 Story Eq., sec. 193a.

*G. A. Kirkland,* for defendant in error.—1. Facts material to the risk made known to the agent before the policy is issued are constructively known to the company (principal), and can not be set up to defeat a recovery on the policy; and this is true whether such information be communicated in detail to the agent while he is acting as such, or whether while acting as such agent only enough be said to call to his mind facts formerly known to him and which he was known to be cognizant of.

2. If the agent of the company knew of the objectionable facts when the policy was taken out, the company is estopped from availing itself of such objections. Banking Co. v. Stone, 49 Texas, 5; May on Ins., secs. 132, 142, 143, 263, 497; Craigie v. Hadley, 1 N. E. Rep., 537; Mark v. Insurance Co., 24 Hun., N. Y., 565; Folsom v. Insurance Co., 8 Blatchf., 170; Insurance Co. v. Luttrell, 89 Ill., 314.

3. If fraud be relied on to recover back money paid to defendant, it should be shown that the fraud was committed by the defendant or some party in interest. And where one procures insurance on the life of another, the latter is neither a party in interest nor an agent of the insured. Defendant procured the insurance on the life of his wife. May on Ins., secs. 591, 213, 214.

4. In a suit by an insurance company to recover back the amount of the policy paid by it, all questions (as warranties) except fraud are deemed to have been settled and waived by such payment. Insurance Co. v. Harper, 3 Hughes (Fed. Cir. Ct.), 260; Insurance Co. v. Minch, 53 N. Y., 144; May on Ins., secs. 442, 575; Wood on Fire Ins., p. 316, sec. 133.

STAYTON, CHIEF JUSTICE.—In 1881 the wife of J. R. Parham applied for and obtained from the appellant corporation a policy of insurance on her own life for the benefit of her husband, and subsequently dying, the sum called for by the policy was paid to the husband.

This action was brought by appellant to recover the sum so paid, on the ground that the policy was obtained through false representations made by the insured in her application, breach of warranties contained in the policy, and fraudulent combination between the wife and husband to thus obtain the policy, as well as false statements made by him after her death for the purpose of securing payment. It was alleged that these matters were unknown to the insurer until after the policy was paid.

Defendant answered by a general denial, and pleaded by way of estoppel that the falsity of the representations made was known to the agent of the company at the time they were made; and to this plaintiff replied collusion between defendant and his wife and its agent for the fraudulent purposes of procuring the policy and its payment.

It was admitted on the trial that by the terms of the application and policy "all of the questions propounded therein were made material and all answers were warranted by the assured to be true, full, and complete; and it is further agreed by counsel for plaintiff and defendant that the application and policy provided expressly that the policy should be null and void if the assured made any false or fraudulent or untrue answer to any question propounded to her, or if she concealed any fact which should have been stated, or if.she should, subsequently to issuance of said policy, become so far intemperate as to permanently impair her health, or if she made any misrepresentations to secure said policy. It is further agreed that said Mrs. Charles W. Parham warranted that her answers were full, complete, and true, and were, as written, the only statements given to the association in reply to its inquiries, and that her answers so given should be the basis of her contract with plaintiff company."

Neither the policy nor the application are found in the transcript, but it was agreed that the following questions and answers were contained in the application:

"1. How long since you professionally consulted a physician? Ans. Not for years.

"2.    Do you use alcoholic stimulants or malt beverages?  Ans.  No.

"3.    How long have you used them and to what extent?  No answer.

"4.    Do you ever or have you ever been in the habit of using opium, chloral, chloroform, ether?  Ans.  She answers 'No' to all of said questions.

"5.    Are your menses regular?  Ans.  Yes.

"6.    Have they always been so?  Ans.  Yes.

"7.    Have you ever had any local disease or serious illness?  If so state date, nature, and duration?  Ans.  No.

"9.    Are you now in good health?  Ans.  Yes.

"10.    Do you know of anything in your personal habits, manner of life, or from any inherited tendency to disease that will shorten life or vitiate a policy if insured?  Ans.  I do not."

Application for the policy was received July 18, 1881, and Mrs. Parham died on July 23, 1882.

It appeared from the certificate of the physician who attended her in her last illness that he had known her about four years, and that he had been her medical adviser for about two years.  He stated that the cause of her death was fatty degeneration of the heart; that she always complained at her menstrual periods, and "suffered with dysmenorrhea, and suffered intensely at times."

Appellee in his application for payment of the policy stated that he had known the insured for twenty-five years, that he was her husband, and that her occupation was that of housekeeper for the family composed of themselves.

He was asked the following question, "Did the deceased violate any condition of the above mentioned policy in respect to the use of spirituous liquors, drinking, or suicide?" and in answer replied that she did not.

Parham and wife married in Hot Springs, Arkansas, and a druggist who knew her from 1879 until her death testified to having frequently sold her morphine by the bottle, and that this frequently occurred during the year 1880. ·

A female attendant at the Springs during the year 1881 and 1882 testified that during these years she waited on Mrs. Parham, and that "she was in the habit of sending me for whisky, which she drank at the bath house.  She also sent me for morphine, which she would pour out and take from her open hand and eat it.  Once she became so intoxicated that I laid her on the sofa at the bath house and bathed her head with cold water until she got sober enough to go home.  I have bought a small bottle of morphine for her in the morning and she would send me for more in a paper in the evening.  This course continued while she bathed at the bath house, a good many months.  I waited on her during a portion of the years 1881 and 1882.  She drank large quantities of whisky, so much at times as to alarm me.  She

would take more at one time than any lady I ever saw, unless it was a drunkard."

Two other female witnesses testified that in 1882 the assured was in the habit of taking morphine in large quantities frequently.

A physician was called to see her twice in one night and found her under the influence of an opiate, and another who knew her from 1878 and frequently visited her professionally stated that prior to 1881 on one occasion he found her dangerously narcotized from the use of morphine; that "she was habituated to the use of morphine prior to 1881. She used morphine all during my acquaintance, except when I practiced the deception of substituting quinine for morphine. The morphine was taken in rather large doses. The effect of its continued use is to create what is known as the 'opium habit' or 'morphine habit,' which when once contracted perverts all the natural secretions and functions of the human body."

Mrs. Cline, who seems to have been on most intimate terms with the assured, "who boarded in the same house with her, sat with her, talked with her," and sometimes slept with her, and who had known her for five years before her death, and testified to being fully informed as to her habits, testified to her continuous use of morphine, and that she also took whisky, and that this course of life continued until a short time before her death. She testified as to the quantity of morphine assured would take at one time, and a physician stated that one who had not acquired the morphine habit could not take such doses.

Appellee testified to the fact of his own knowledge that his wife had been accustomed to use morphine before the policy was applied for, and that he gave this as a reason to the agent of the company for not desiring to apply for a policy on the life of his wife when the agent solicited him to do so.

The agent of the company who solicited the insurance was a physician, and treated the assured for the opium habit before he took her application. He stated that he "was fully posted in regard to her health, habits, and the history connected with her habit. * * * The answers were given by Mrs. Parham and filled in by myself. I believe the answers given by Mrs. Parham were in good faith and truthful in every respect. I only knew that Mrs. Parham used opium and other drugs from her own statements and those of her husband."

Appellee's statement in regard to the facts preceding the issuance of the policy that transpired between him and the agent is: "Dr. C. J. Weatherby had been my family physician, and a few days before the issuance of the policy he came to my livery stable in Hot Springs and said to me that he was now a life insurance agent and would need a good many horses in his business. He had already sent around and gotten horses from our stable a number of times just prior to this conversation. He further said at said time, or in same conversation above

referred to, that I ought to help him out by taking out a policy on my life. I told him in reply that I already had a policy on my life. * * * Weatherby then asked me to take out a policy on my wife's life. I replied that she was opposed to insurance, and besides that she had been addicted to the use of morphine. I believed that the use of opium was objectionable to insurance companies. Weatherby replied: 'I know all about that. I have cured her of the habit. I know more about her condition than you do. She is as good a risk as our company wants and is a better risk than several others (naming them) to whom we have issued policies.' He furthermore said that if I would give him permission to do so he would call on my wife and try to get her consent to the issuance of the policy. I told him I had no objection. A few days after this conversation my wife informed me that she had been examined for the policy, and in a short time it was issued. I paid Dr. Weatherby the premium and other fees for the issuance of this policy by crediting them on his livery bill for horses hired by him from the stable of myself and partner. I told him I wanted the policy to be for a less amount than it was issued for, but Weatherby said he wanted me to make it larger so that the premiums would amount to more and so that the help to him would be greater. I then consented to the amount at which it was issued."

After the death of Mrs. Parham and while he was taking steps to collect the policy a woman who had full knowledge of her habits and of the facts on which this action to recover the money paid is based, suggested to him that the company would never pay the policy if it had possession of the facts. Parham requested her to remain silent, "to keep my own counsel as to what I knew about it, and promised me $250 if I would do so." That promise was in writing, as follows:

"HOT SPRINGS, ARK., August 7, 1882.

"Due Mrs. J. A. Cline $250, to be paid when the insurance money is paid to me on Mrs. C. W. Parham's life. If the insurance money is not collected the amount mentioned will not be paid.

"J. R. PARHAM."

He paid $10 on that obligation and indorsed the credit on same day. The next writing from him was as follows:

"APRIL 7, 1883.

"*Mrs. Cline:*—I received a letter this morning saying everything is all right and instructions how to send papers. Will get returns about the middle of next week.    Respectfully,    J. P."

The woman was silent, and a few days after the date of this last communication Parham received the money on the policy. She then sent his obligation to the place where he was for collection, and received a reply of which the following is found to be the substance:

"*Mrs. Cline:*—That note was sent here for collection. I positively re-fuse to pay and will not be annoyed by you, and I suppose you understand the consequences of blackmail.                    J. R. PARHAM."

The woman gave a detailed statement of the negotiations between them, having for their purpose the suppression of information which would prevent the payment of the policy should it reach the officers of the insurance company; and while this evidence, coming as it does from a *particeps criminis,* would not ordinarily be entitled to full credence, there can be no doubt as to its substantial correctness, for Parham as a witness virtually admits it all but seeks to excuse his conduct.

Under the evidence there can be no denial of the fact that the answers to the first, second, fourth, fifth, sixth, seventh, ninth and eleventh questions contained in the application for insurance were untrue and known to be untrue by Mrs. Parham and Weatherby, the agent of the company; but from the record, while there is nothing to relieve the applicant from the legal result that would ordinarily flow from such misstatement, there is strong reason to believe that the unfortunate woman may not have fully comprehended the moral question involved.

The evidence further leaves no doubt that the husband knew that these representations were untrue at the time the policy was received and at the time he demanded and received the money on it. He had the policy in his possession, and can not be heard to say that he was ignorant of anything that appeared on it at the time he was seeking to collect the money, and in order to do this was bribing at least one person to keep silent. He may have been in fact ignorant of the representations made by his wife in the application at the time these representations were made, but of the contents of the policy he can not be heard to say that he was ignorant at any time after he received it, which was soon after it issued.

The policy was applied for with his consent by his wife for his benefit and the premiums were paid by him, and it would seem that under this state of facts the wife was but his agent, although nominally a party to the contract, whose knowledge and acts ought in law to be attributed to him.

If the representations made by the wife had not been untrue, the evidence leaves no doubt of the husband's knowledge of the occurrence of such facts after the policy issued as, under its terms, would avoid it.

We have no disposition to discuss the facts presented by the record, and have made the forgoing statement in order to the inquiry whether the charges given were such as under the facts ought to have been given.

It is contended that plaintiff is not entitled to recover on account of any misrepresentation made by Mrs. Parham in her application if the agent of the company knew at the time they were made that they were untrue; that the knowledge of the agent would affect the company

with notice that the representations were not true, and the company is therefore estopped because it received the premium and issued the policy knowing the falsity of the statement.

The court conceiving this to be true under the facts of this case, gave the following charge: "If you find from the evidence in this case that the assured Mrs. Charles W. Parham made false answers or statements in her application for insurance, but that the same were not made by procurement or with the consent of defendant, and if you further find that the agent of plaintiff who took said insurance knew at the time such false answers or statement was made, and while acting as such agent, that it was false, then the plaintiff can not recover in this suit by reason of such false answers or statement, so known by the agent to be false, but is estopped from so doing."

Plaintiff had alleged collusion between Weatherby and the assured and her husband to obtain the policy on false representations, and in view of the evidence no court would be authorized to assume that this was not proved.

The court refused to give a charge to the effect that if such a state of facts existed the knowledge of the agent of the falsity of the representations would not prevent a recovery if the policy was issued in reliance on the truth of the representations contained in the application if the money was paid in ignorance of their falsity.

It is ordinarily true that a principal is affected with notice of such facts as come to the knowledge of his agent in the course of his business. When an agent, however, ceases to act for his principal in good faith, and through collusion with another, desiring through him to cheat and defraud the principal, practically enters into the service of that other for the purpose of promoting the interest of that person or the common interest of himself and that other in fraud of his principal, then the person who so avails himself of the services of such an agent can not claim that his act or his knowledge in reference to matters to which the fraudulent collusion relates are binding on the person intended to be defrauded. In such a case the agent *pro hac vice* becomes the agent of the person he collusively serves.

In Insurance Company v. Minch, 53 New York, 150, it was claimed that the medical examiner for the company in collusion with an applicant made a false statement as to her condition to obtain a policy, and in that case, as in this, it was claimed that the company was chargeable with the knowledge of the true condition of the applicant because its examiner knew it, but in disposing of the question the court held that: "If Mr. Potter, the husband, and deceased knew that the latter had an incurable cancer, and acted in concert in procuring the policy, the plaintiffs were entitled to recover. Even if the company would otherwise be chargeable with the knowledge of Dr. Potter as their agent,

they would be relieved from it under such circumstances. If a person colludes with an agent to cheat the principal the latter is not responsible for the acts or knowledge of the agent. The rule which charges the principal with what the agent knows is for the protection of innocent third persons, and not those who use the agent to further their own frauds upon the principal."

To same effect is Smith v. Insurance Company, 24 Pennsylvania State, 320.

The instruction given withdrew from the jury all question of collusion between Weatherby, the assured, and her husband, and assumed that the company stood charged with notice of every fact known to Weatherby. This was error.

Among others the court gave the following charge: "You are charged, first, that if you find from the evidence in this case that Mrs. Charles W. Parham made an application to plaintiff association for a policy of insurance on her life for the benefit of defendant, and that such policy was issued to her by plaintiff on such application, and that afterward, on the death of said Mrs. Charles W. Parham, the defendant prepared and delivered to plaintiff the required affidavits as to her death, and that relying upon said affidavits and the truth of the answers and statements made in said application the plaintiff paid over to the defendant the sum of money alleged to have been paid to him, or any part thereof, and if you further find that said policy was obtained by the false and fraudulent representations of said Mrs. Charles W. Parham in her application therefor, and that the defendant J. R. Parham aided, assisted, or abetted in such fraud, having knowledge of her fraudulent design, you will find for the plaintiff."

Charges were asked by plaintiff and refused, which, in effect, embodied the same propositions, omitting, however, any statement that it was necessary to entitle plaintiff to recover that it should appear that Parham aided, assisted, or abetted his wife in making the false representations, knowing her fraudulent design in so doing.

The sixth paragraph of the charge given was as follows: "In order to entitle the plaintiff to recover in this case it is necessary that you should find not only that there were fraudulent or false statements or misrepresentations or concealments by the assured Mrs. Charles W. Parham, but you must further find that the defendant J. R. Parham either knowingly participated in them at the time, or knowing them at the time he procured the money (if procured at all), fraudulently concealed a knowledge of them from plaintiff, and if you find that the defendant did not knowingly participate in any way in any such false statements, misrepresentations, or concealments (if any there were), and did not know of them and conceal them when he received the money, you will return a verdict for the defendant."

Throughout the charge the participation by defendant in the false representations, or his knowledge of them and their concealment by him, was made necessary to a recovery by plaintiff.

As before said, the wife was practically the agent of her husband in procuring the policy for his benefit, and we are of opinion that any misrepresentation made by her is as binding upon him as though made with his knowledge or procurement or by himself. If, however, this be not so, this would not change the result, leaving out of view all questions of estoppel.

By the terms of the policy the contract evidenced by it was to be inoperative if the representations on which it was obtained were untrue. That many of them of the most material character were untrue can not be denied from the uncontroverted testimony found in the record, and we are unable to perceive any principle of law on which vitality to the contract can be given when the parties agreed that it should be inoperative in a named event shown to have occurred, simply because the beneficiary may not knowingly have participated in or aided or advised the making of such representations, or even on the ground that he may not have known and concealed their falsity after the death of his wife.

The contract is the basis of every right any person can claim under it, and that provided that the policy should be inoperative in case the representations on which it was based were untrue, and not that it should be inoperative only in the event that the beneficiary knew that they were untrue at the time they were made, aided, advised, or abetted the person making them, or concealed the fact of their falsity after the death of his wife; and courts have neither the power nor right to change the contract made by the parties and to declare a liability on a state of facts which the parties never agreed should fix it.

Had a knowledge of the falsity of the representations come to the knowledge of the plaintiff, then subsequent recognition of its validity and conduct inconsistent with an intention to insist upon its nullity might operate an estoppel, but no such case is shown.

Were this an action on the policy it would not be contended that a recovery could be had on it on the ground that the beneficiary was ignorant at any time of the existence of the facts which by its terms rendered it inoperative; for a beneficiary under or assignee of a policy of insurance, in the absence of some fact operating as an estoppel, takes and holds subject to the terms of the contract itself; and if, as between the immediate parties to it, it is inoperative because procured by false representations, then it is inoperative to confer right on the beneficiary named in it.

This case differs from the case of Insurance Company v. Minch only in the fact that in that case the policy was paid to the administrator

of the estate of the insured, and suit was brought against him to recover the sum so paid on the ground that the policy was obtained by false representations, while this is brought against the beneficiary to recover the sum paid to him in ignorance of the fact that the policy was obtained by false representations.

In that case it was held that an insurance company that had paid a policy obtained by fraud, in ignorance of that fact, was entitled to recover the sum paid, and this we understand to be the law, whatever may be the rule where money is paid through want of knowledge of some fact, not amounting to fraud, in obtaining the policy, or fraudulent representation to obtain the money after the death occurs, which might have been set up as a defense in an action on the policy. Insurance Co. v. Wager, 27 Barb., 354; Smith v. Insurance Co., 62 N. Y., 87; Insurance Co. v. Sturgis, 13 Gray, 181; Eagan v. Insurance Co., 10 W. Va., 589; Bliss on Life Ins., 416; Phillips on Ins., 1998.

The view taken of the questions noticed are decisive of this appeal, and other assignments of error are thus practically disposed of, or are not sustainable.

For the errors noticed the judgment will be reversed and the cause remanded.

*Reversed and remanded.*

Delivered April 17, 1891.