**DALLAS BUILDING & LOAN ASS'N v. PATTERSON et al.**

No. 12633.

Court of Civil Appeals of Texas. Fort Worth.

Feb. 20, 1932.

Rehearing Denied March 19, 1932.

C. C. Renfro and Thompson, Knight, Baker & Harris, all of Dallas, and Ray Winder, of Gainesville, for appellant.

Adams & Jones, of Gainesville, for appellees.

### BUCK, J.

Mrs. Edna E. Patterson, joined pro forma by her husband, J. R. M. Patterson, living in Gainesville, sued the defendant, Dallas Building & Loan Association, to enjoin it and R. B. Cowan, as trustee, from selling Lot 1, block A, Putman's addition to the city of Gainesville, and also asked that a certain trust deed against said property be canceled.

The cause was tried before a jury, but, at the conclusion of the evidence, the trial court gave a peremptory instruction for the plaintiff, and the defendant has appealed.

The evidence showed that lots 1 and 8 are adjacent to each other, and that the defendant owned a duplex apartment house on lot 8, and owned a residence on lot 1. The plaintiff formerly lived on California street, Gainesville, but, about three years before the circumstances related in this opinion, traded the California street property for the property the defendants now own. Mr. and Mrs. Patterson had been husband and wife since 1893. F. H. Dayton and his son, A. O. Dayton, were agents in Gainesville of the defendant. J. R. M. Patterson went to A. O. Dayton about borrowing some money on lot 1, which at the time was occupied by plaintiffs as their homestead; the other house being rented. He testified that he did not tell A. O. Dayton that he did not live on lot 1, he knew it; that both he and A. O. Dayton understood that the loan was to be made on the home place. He executed a trust deed signed by Mrs. Patterson and her husband on the property. This trust deed was made to J. G. Loving, trustee, and conveyed lot 1, block A, Putman's addition to the city of Gainesville, to secure an indebtedness of $2,750, evidenced by a note signed by both Mr. and Mrs. Patterson of even date, payable to the defendant Dallas Building & Loan Association, and, in connection with the execution of the deed of trust, Mr. and Mrs. Patterson made an affidavit as follows:

"We do not use, claim, occupy or enjoy the use of this property as our homestead nor neither have we used, claimed or occupied or enjoyed the use of the same since August 1st, 1927, when we permanently abandoned the use of the same and moved all of our effects to our residence on Lot No. 8 in Block No. A of Putman's Addn., where we have resided continuously since this date and we do now designate and set apart as our homestead all of lot No. 8 in block No. A of Putman's Addn., to the City of Gainesville, Cooke County, Texas. And we do hereby disclaim any interest that we might or may have to lot 1 of Block A, Putman's Addn., to the City of Gainesville, Cooke County, Texas, as our homestead or as any part thereof, the same being separate and apart from our homestead and is fenced and fully separated therefrom."

Then affiants refer to an instrument entitled "Mechanic's and Builder's Lien" to Joe N. Boozer, a lumber man in Gainesville, giving a mechanic's lien on lot 1, Block A, Putman's addition, and stated that such instrument was incorrect, as it was intended to execute a mechanic's lien to Joe M. Boozer for improvements on the homestead which should be known as all of lot 8, block A, Putman's addition, and that said improvements are to be made, and are now being made, with money to be borrowed on lot 1, block A, Putman's addition.

R. B. Cowan, who was in the abstract business and a notary public of Gainesville, testified that he knew the Pattersons, and had known them for many years: That he took the acknowledgment of Mr. and Mrs. Patterson on February 5, 1929, and that he was not representing the Dallas Building & Loan Association. That he took the acknowledgment on the homestead affidavit. That the affidavit was handed to him the evening before he took the verification of it. That he was called to Dayton & Dayton's office to take the verification, and Mr. Patterson carried it out with him and did not sign it then, saying that he had something else on his mind, and was busy and would carry it out and look it over and bring it back. That, when he took the verification, he asked Mr. Patterson if he understood it, and he said, "Yes, I glanced over it." That he took the verification and asked Mr. Patterson then if he understood and acknowledged it for the purposes and consideration therein expressed. That, some time before the application for this loan was made, Mr. Patterson came to him and asked if he could make him a loan, as he was needing some money. He did not tell Mr. Patterson that he could make him a loan on his homestead, but did tell him that he could not make a loan, but Dayton & Dayton had been making some loans and they might make it. That he sent him to Dayton & Dayton's office to see them. That he spoke to A. O. Dayton about making the loan on lot 1, and Dayton said, "Yes, I know it is a homestead, but I have a good affidavit." That he did not prepare that affi-

davit as to the property not being a homestead. That it was written on Dayton & Dayton's letterhead.

Mr. and Mrs. Patterson both testified, and both acknowledged that they executed the deed of trust and the affidavit attached thereto, though Mrs. Patterson testified that she did not read it, and Mr. Cowan did not swear her to it.

The evidence further shows that, some time prior to this application, on March 18, 1929, Mr. and Mrs. Patterson executed an instrument before Ida Mae Cuthrell, a notary public, purporting to be a deed of trust in favor of Joe N. Boozer, as contractor, and that the plaintiffs signed the same and acknowledged it, but Mr. Boozer would not allow himself to be put in said contract as contractor.

Mr. Patterson testified that he had lived in Gainesville over 50 years, and was in business there quite a while; that there was no incumbrance or debts against lot 1; that he never did go to Mr. F. H. Dayton and ask him to help him get a loan, or to make a loan for him on his home place through some loan company before that application was made; that he never did talk to Mr. Cowan about getting a loan, but Mr. Cowan just volunteered; that he had no idea of asking for a loan, in fact did not know it could be done; that possibly he remembered that Mr. Cowan said that the only way he could get a loan on it was to put a mechanic's lien on it for improvements; that it was his understanding that this loan was on his home place on lot 1, as that was the only place he was considering; that he had no idea of getting a loan on the other place, for there was already a loan on it; that he never did tell Mr. A. O. Dayton that he did not live in that house on the corner, that he knew it; that he had been to his house, and he possibly drove by there once to look it over; that Mr. A. O. Dayton and he understood that this loan was to be on the home place. He further testified:

"After I signed that [the mechanic's lien] Joe Boozer came to see me about it. He said he didn't want to deal in that matter any more, that he had signed some for Mr. Dayton but wasn't going to sign any more. And I told him it was perfectly all right. I told Mr. A. O. Dayton that Joe Boozer was a good man and he would do whatever he said he would do, and if he was his preference he would be all right. However, I did not tell Joe Boozer that A. O. Dayton had told me that just anybody would do to put in there as contractor. I told Mr. A. O. Dayton that Mr. Boozer would be all right if he wanted to serve and I naturally told Mr. Boozer that. At the time we made that mechanic's lien contract we was thinking of making some improvements on Lot No. 1; it was our intention to use a part of the

funds, a small per cent in improving possibly both of the apartments. * * *

"I signed that note to the Dallas Building & Loan Association for $2,750.00, and that deed of trust to secure that. I also signed the affidavit as to homestead which you have in your hand.

"I tried repeatedly to get a loan on my home place for several weeks—they were working on that, they were doing the work, I wasn't trying. I didn't go up and talk to Mr. A. O. Dayton about the loan almost every day after I made the application. I couldn't tell you how often I went by to see him and talked to him about it. I was up there several times and sometimes telephoned him. They showed me letters from the loan company and told me it would be out in a few days, and I finally went up there and told Mr. Dayton if they weren't going to put the loan through I wanted to cut it out. I was not in urgent need of money at that time."

Mr. F. H. Dayton, the father and senior member of the firm of Dayton & Dayton, testified that A. O. Dayton was the junior member; that Dayton & Dayton represented the Dallas Building & Loan Association in taking applications for loans on real estate at that time. He further testified:

"In a way I remember the loan made by the Dallas Building & Loan Association to J. R. M. and Edna Patterson. I don't remember much about the details because the boy handled the loan principally—A. O. Dayton handled it. A good while before this transaction in question came up Mr. J. R. M. Patterson came to me for a loan on some of his property. I rather think the first time he spoke to me about it was on the sidewalk, but he did in a few days come to the office to ask about a loan. He said he wanted to get a loan on his home place, and I told him the homestead law would operate against him, that I could make the loan only for improvements. He said he didn't want to make any improvements. I talked to him a number of times before that, probably three or four months before making this application here. I think at the time he made this application in February, 1919, I was out of the office. I don't remember that application being made, however, I knew in a general way it had been made but I didn't take the application.

"I did not know that the loan was being negotiated on his home place. I understood that he had made a temporary move to get the loan from the Hisperian Loan Company and that he was moving back to this house where he had got the loan on and make a loan on this house he had moved away from. I went with Miss Cutherell to Mr. Patterson's house to have Mrs. Patterson sign that deed of trust in that loan. They were in the house on the corner at that

time. I think I told Mrs. Patterson what that deed of trust was—I usually did. I always meant to tell a woman what a deed of trust was. I would say I did do it because it is always my custom to do so. I did not know at that time that the property described in that deed of trust was the place that Mr. and Mrs. Patterson were at that time. I knew there was two houses there at that time, but I really thought we was taking the loan on the other house. Mr. Patterson paid the firm for making this loan; he paid one per cent."

### Opinion.

 It is our opinion that the trial court erred in instructing a verdict for the plaintiffs in this suit. We think the evidence tended to show an unlawful and fraudulent conspiracy between A. O. Dayton and the plaintiffs to secure this loan on the homestead.

In the case of Williams v. Daniel, 30 S.W. (2d) 711, 714, affirmed without opinion by the Supreme Court, this court, speaking through Chief Justice Conner, said:

"However, it is held in all of the cases where the subject is discussed that the rule that binds the principal by notice of the facts known to the agent does not apply if the agent and a third person have colluded to defraud the principal. See Standard Savings & Loan Ass'n v. Fitts (Tex. Civ. App.) 24 S.W.(2d) 507; Cooper v. Ford, 29 Tex. Civ. App. 253, 69 S. W. 487; Centennial Mut. Life Ass'n v. Parham, 80 Tex. 518, 16 S. W. 316. In the last-cited case it is said, quoting from the headnotes:

" 'Where the agent of an insurance company enters into a conspiracy with an applicant for a life policy to insert false statements in the application, and thereby induce the company to issue the policy, he ceases to be the agent of the latter, and becomes the agent of the applicant, and the company cannot be charged with notice of the facts known to such agent.' "

In Carstens v. Landrum, 17 S.W.(2d) 803, by the Commission of Appeals, and approved by the Supreme Court, it was held, quoting from the headnotes: "Declarations of husband and wife contained in deed of trust, with respect to which of two places was intended as their home, held to raise estoppel against denial of truth of declarations in so far as deed of trust lien was concerned, where occupancy of mortgaged farm by husband and his son was palpably ambiguous in respect to homestead intention."

In the cited case Carstens brought suit against Landrum and wife on a promissory note for $2,000 and to foreclose a deed of trust lien on a tract of 200 acres of land in Atascosa county. The deed of trust recited that the property attempted to be covered by the deed of trust was not in fact their homestead, but their homestead was in the city of San Antonio. The facts show that Landrum and wife had six minor girls and a little boy. About September, 1917, it was planned by Landrum and his wife that the latter should take the six minor girls with her to San Antonio and live there temporarily, for the purpose of sending the three youngest girls to school and putting the three older girls to work in some remunerative employment to help support the family. In pursuit of this plan, Mrs. Landrum and the girls moved to San Antonio and lived in a rented house. Landrum moved most of the furniture and household effects from the dwelling on the farm to San Antonio, for the use of Mrs. Landrum and the girls. In the suit Landrum and wife pleaded their homestead rights in the farm as invalidating the deed of trust in controversy. The executors of Carstens pleaded an estoppel against the assertion of said homestead rights, basing such plea on the recitals of the deed of trust. The case was tried by a jury, and a verdict was rendered on special issues. Judgment was entered against Landrum for the amount due on the note, but denied a foreclosure of the deed of trust lien. The judgment was affirmed by the Court of Civil Appeals. See 5 S.W.(2d) 208.

Before the Supreme Court, judgment of the trial court was reversed and judgment rendered for the plaintiffs. The court said: "We are mindful that it has repeatedly been held that, so long as one place is actually occupied as a home, another place cannot be impressed with the homestead character by an intention to use it as a home in the future. O'Brien v. Woeltz, 94 Tex. 154, 58 S. W. 943, 59 S. W. 535, 86 Am. St. Rep. 829; Archibald v. Jacobs, 69 Tex. 251, 6 S. W. 177; Johnston v. Martin, 81 Tex. 18, 16 S. W. 550; Pierce v. Langston (Tex. Civ. App.) 193 S. W. 745. But in none of these decisions was the occupancy of the first place maintained under such ambiguous circumstances as in the present instance. In the light of the attending circumstances, the occupancy of the farm by Landrum and his little boy was palpably ambiguous in respect of the homestead intention, and it is not thought that the above-cited decisions apply."

In Purdy v. Grove, 35 S.W.(2d) 1078, by the Court of Civil Appeals at Eastland, writ of error refused, for many years prior to the execution of the note and deed of trust in suit, J. T. Purdy and wife resided in Gorman, Tex., occupying a family residence and maintaining a business homestead on lot 7, separate and disconnected from that on which was situated the residence. About August, 1924, the Purdys purchased a residence in Abilene, where Mrs. Purdy and her daughters moved. She took with her sufficient furniture and fixtures from the Gorman resi-

dence to equip the Abilene residence for housekeeping purposes. Purdy remained in Gorman, as claimed in his testimony, and worked in a garage on lot 7, and slept in a room reserved at the old residence. At the conclusion of the testimony, the trial court instructed a verdict for the plaintiff, establishing the indebtedness and foreclosing the deed of trust lien. The defendants appealed. The Court of Civil Appeals held that, under the facts, the action and judgment of the trial court should be affirmed, and it was so ordered.

■■ A party cannot take advantage of his own fraud. Johnson v. Byler, 38 Tex. 606. Married women may be estopped by their acts or conduct. Cravens v. Booth, 8 Tex. 243, 58 Am. Dec. 112.

Judge Willie, in Blum v. Merchant, 58 Tex. 400, said that the elements of estoppel are: "A false representation, or concealment of material facts, made with a knowledge of the facts; ignorance on the part of the person to whom the representations are made, or from whom the facts are concealed; intention that such person should act upon it, and action on his part induced thereby."

In Davis v. Allison, 109 Tex. 440, 211 S. W. 980, 984, the Supreme Court, speaking through Judge Phillips, said: "Estoppel is a doctrine for the prevention of injustice. It is for the protection of those who have been misled by that which upon its face was fair, and whose character as represented parties to the deception will not, in the interest of justice, be heard to deny. But one entitled to its protection must have been misled."

Appellees urge that the rule laid down in Texas Land & Loan Co. v. Blalock, 76 Tex. 85, 13 S. W. 12, 13, should apply. It is there said:

"The fact of actual possession and use, as the home of the family, was one against which the lender could not shut its eyes; and this fact, coupled with the interest held by the borrower in the land, made the property homestead in fact and in law, on which the constitution declares no lien, such as claimed in this case, can exist. Every person dealing with land must take notice of an actual, open, and exclusive possession; and when this, concurring with interest in the possessor, makes it homestead, the lender stands charged with notice of that fact, it matters not what declarations to the contrary the borrower may make. * * * Possession was open, certain, and in character in no respect ambiguous. It was such as gave homestead right, and the lender cannot be heard to say that it did not know it. The constitution forbidding the fixing on the homestead of liens other than such as are thereby expressly permitted, no estoppel can arise in favor of a lender, who has attempted to secure a lien on homestead in actual use and possession of the family, based on declarations of the husband and wife, made orally or in writing, contrary to the fact. To hold otherwise would practically abrogate the constitution. If property be homestead in fact and law, lenders must understand that liens cannot be fixed upon it, and that declarations of husband and wife to the contrary, however made, must not be relied upon. They must further understand that no designation of homestead, contrary to the fact, will enable parties to evade the law, and incumber homesteads with liens forbidden by the constitution. [Equitable] Mortgage Co. v. Norton, 71 Tex. 683, 10 S. W. 301; Pellat v. Decker, 72 Tex. 581, 10 S. W. 696; Kempner v. Comer, 73 Tex. 203, 11 S. W. 194."

Judge Stayton, in writing for the Supreme Court in the cited case, does not discuss what the rule would be in a case where the agent of a loan company colluded with the borrower in misrepresenting the facts.

In Parrish & Potter v. Hawes, 95 Tex. 185, 66 S. W. 209, 211, Justice Williams, speaking for the Supreme Court, where that court had for consideration on certified questions the issues of estoppel as applied to homestead representations, said, in discussing the Blalock Case, supra: "In that case, Blalock and wife, at the time they gave the mortgage, were living upon the mortgaged property as their home, and used no other property as such. They represented that it was not their homestead, but that other land was, which they did not then and had never resided upon or used as a home. In fact and in law, the property mortgaged was their only home; and the court so held, saying: 'If property be homestead in fact and law, lenders must understand that liens cannot be fixed upon it, and that declarations of husband and wife to the contrary, however made, must not be relied upon. They must further understand that no designation of homestead contrary to the fact will enable parties to evade the law and incumber homesteads with liens forbidden by the constitution.' It was further said: 'The fact of actual possession and use as the home of the family was one against which the lender could not shut his eyes; and this fact, coupled with the interest held by the borrowers in the land, made the property homestead in fact and in law, on which the constitution declares no lien such as claimed in this case can exist.' These observations were perfectly just and true of the case before the court, and of all others in which the facts so unequivocally manifest such exclusive use of the one piece of property as homestead that the law stamps it as such. Its status in fact and in law is thus established, and of this all persons must take notice, and hence declarations of the husband and wife plainly contrary thereto cannot be relied on. But if we should attempt to apply the doctrine to the present case, which one of these places should we say was, in law, the home-

stead of defendants? Plainly, we could say this of neither place; and, if the court cannot know this, how can it be held that persons dealing with the husband and wife must know it from the same facts? The determination of the homestead depending as we have seen, either upon the election of the parties or upon the existence of an intention in their minds, every one who would ascertain the homestead must necessarily learn what election is made or what intention exists. This is precisely what the lender did. The fact of an unequivocal and exclusive use of the place to the exclusion of the other was not present, as in the Blalock Case, to notify the lender that the representations made were false; that they were, in truth, misrepresentations not only of patent and notorious facts, but of a legal status which the property had acquired."

We do not believe the Blalock Case is authority for holding that notice to the agent of the loan company negotiating the loan of the homestead character of the property in controversy was notice to the loan company, when, as the evidence shows in this case, the agent colluded with the borrower to conceal that fact from the knowledge of the loan company. We do not question the soundness of the facts expressed by Judge Stayton in the Blalock Case, but do not think they apply in this case.

The judgment of the trial court is reversed, and the cause is remanded.

### On Appellees' Motion for Rehearing.

It is true that no mortgage, trust deed, or other lien on the homestead shall ever be valid except for the purchase money therefor or for improvements made thereon, as provided by the statutes and the Constitution, but a homesteader may be estopped to deny the validity of a lien. In First Texas Joint Stock Land Bank v. J. L. Chapman et ux., 48 S.W. (2d) 651, opinion by Chief Justice Conner of this court, it is held that the wife may not be guilty of affirmative fraud in order to estop her from denying the validity of the lien. See Guaranty Bond State Bank v. Kelley, 13 S.W.(2d) 69, by Justice Speer, of the Commission of Appeals, and approved by the Supreme Court. There it is said, quoting from the headnotes: "'Fraud' which will estop a married woman is not necessarily intentional fraud, but rather an intentional affirmative act of hers, which operates as a legal fraud, whether so intended or not."

As said in First Texas Joint Stock Land Bank v. J. L. Chapman, supra: "So where, as is the case shown here, a bank in good faith in answer to such inquiry has been assured by the solemn declarations of persons who must be presumed to best know that the land in controversy was free from homestead claim upon the date of the conveyances under which the bank is claiming, such inquiry and assurances must be held to warrant the bank's acting upon the representations made as being true. To hold otherwise would be to support a legal fraud, even though the person so falsely representing the true state of affairs may be a married woman"—citing Guaranty Bond State Bank v. Kelley, supra.

In the instant case Mr. and Mrs. Patterson both testified and both acknowledged that they executed the deed of trust and the affidavit attached thereto, though Mrs. Patterson testified that she did not read it and Mr. Cowan did not swear her to it. In Carstens v. Landrum (Tex. Com. App.) 17 S.W.(2d) 803, 805, it is said: "We are mindful that it has repeatedly been held that, so long as one place is actually occupied as a home, another place cannot be impressed with the homestead character by an intention to use it as a home in the future. O'Brien v. Woeltz, 94 Tex. 154, 58 S. W. 943, 59 S. W. 535, 86 Am. St. Rep. 829; Archibald v. Jacobs, 69 Tex. 251, 6 S. W. 177; Johnston v. Martin, 81 Tex. 18, 16 S. W. 550; Pierce v. Langston (Tex. Civ. App.) 193 S. W. 745. But in none of these decisions was the occupancy of the first place maintained under such ambiguous circumstances as in the present instance. In the light of the attending circumstances, the occupancy of the farm by Landrum and his little boy was palpably ambiguous in respect of the homestead intention, and it is not thought that the above-cited decisions apply."

Appellees urge that we are in conflict with the case of Gibraltar Savings & Building Ass'n v. Harper (Tex. Civ. App.) 41 S.W. (2d) 130, 131. It will be noted that in the cited case the decision in no manner involves a conspiracy between the borrower and the agent of the lender. Harper did not own the property which he stated was his homestead in the affidavit furnished the loan company, and the lender might easily have obtained such knowledge from the deed records; while in the case at bar the appellees did own the property described as their homestead in the affidavit furnished appellant, and said property was furnished and suitably improved for a homestead. Although the court did not reverse this cause by holding that there was an ambiguity in the use of said properties, nevertheless the facts in this case seem to be as strong as those in the case of Carstens v. Landrum, 17 S.W.(2d) 803, by the Commission of Appeals.

We conclude that our former holding should be adhered to, and the appellees' motion for rehearing is overruled.