MARYLAND INSURANCE COMPANY, Appellant,

v.

HEAD INDUSTRIAL COATINGS AND SERVICES, INC., Appellee.

No. 06–94–00071–CV.

Court of Appeals of Texas, Texarkana.

Aug. 31, 1995.

Portia J. Bott, R. Brent Cooper, Cooper, Huddleston, Aldous, Dallas, for appellant.

Scott Patrick Stolley, Thompson, Coe, Cousins, Irons, Dallas, for Gans & Smith.

Winford L. Dunn, Jr., Smith, Stroud, McClerkin, Dunn, Texarkana, for Head Industrial.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

GRANT, Justice.

This is a bad faith insurance case with liability premised on violations of the Insurance Code. Maryland Insurance Company appeals from a judgment rendered in favor of its insured, Head Industrial Coatings and Services, Inc., and also appeals from a take-nothing judgment rendered against it on its third-party action against Gans & Smith Insurance Agency. The primary issues on ap-

peal involve the existence of a viable cause of action under the Insurance Code for unfair claims settlement practices and bad faith conduct by an insurer on a third-party liability policy, the sufficiency of the evidence to support the jury's determination that Maryland engaged in unfair or deceptive acts, the amount of the jury finding of damages, the effect of a settlement agreement, and the assessment of a statutory interest penalty against Maryland because of its tardy payment of a claim.

Head Industrial Coatings and Services, Inc. is one of two family-owned businesses that together provide vacuuming, sandblasting, and coating services to various industries, including Texas Utilities (TU), that utilize storage tanks and towers. As a prerequisite to working for TU, Head agreed to indemnify TU for any injury claims arising out of services Head performed and to purchase contractual liability insurance coverage to protect TU against claims arising out of work performed by Head at TU facilities.

Head contacted its local insurance agent, Hermes Payne of Gans & Smith Insurance Agency, and purchased a commercial general liability policy with a $500,000 policy limit. Maryland Insurance Company was the insurance carrier. Head intended to purchase contractual liability insurance as part of the policy and communicated this intent to Payne, who is one of the owners of Gans & Smith. There is evidence indicating that Head paid the premiums for a policy that included the contractual liability insurance. Payne committed a clerical error, however, and the policy actually issued to Head did not include the proper endorsement to create such coverage.

The underlying cause of the present litigation is a suit filed in 1989 against TU and Head by Don Nelson, a Head employee, who was injured while working on TU's premises during the time period covered by the insurance policy. The suit papers were forwarded to Maryland's Dallas claims office. Maryland assigned the matter to one of its claims adjusters, Bob Smith, and also employed an attorney to defend Head against Nelson's claims.

In February 1990, TU sent a demand letter to Head, requesting that Head indemnify TU and provide it with a defense in the Nelson suit as agreed, and later filed a cross-claim against Head in the Nelson suit based on contractual indemnity. Head forwarded the demand letter to Smith. Smith consulted an attorney, who correctly opined that TU's cross-claim was not covered under the general commercial liability policy issued to Head. The claims adjuster sent Head a reservation-of-rights letter advising Head of potential coverage problems concerning both Nelson's personal injury claims and any contractual indemnity claims. Head contacted Payne, who assured Head that TU's contractual liability claim was covered.

After receiving a copy of the reservation-of-rights letter, Payne reviewed the file and discovered his error in failing to secure insurance coverage to protect TU. Payne was embarrassed and attempted to contact a friend, Tom Southard, who is the Texas claims manager for Maryland Insurance Company. Payne left a message requesting that Southard call him about a problem with a claim, but did not specify what claim was troublesome. Southard did not return the call and denied receiving the message. Payne made no further effort to inform Maryland about the error. Some time after the judgment was rendered in the Nelson suit (over two years later), Payne finally talked to Southard but did not disclose his error in excluding the promised contractual liability coverage from Head's policy. Payne explained that by the time he spoke with Southard he was represented by an attorney and did not know what he could or could not tell Southard.

The attorney Maryland hired to represent Head in the Nelson suit contacted Smith, the claims adjuster, and said that Boyce Head, the president of Head Industrial, was irate because he had been promised contractual liability coverage. Southard testified that insureds tend to be upset when coverage is denied. Southard also testified that copies of all communications were sent to Gans & Smith and that, in his experience, an agent who believes that the adjuster is wrong in his assessment of coverage usually contacts the

claims adjustment office with his concerns. Southard had known Payne to raise such coverage questions in the past.

In May 1990, Maryland denied coverage for the contractual liability claim asserted by TU. Maryland's denial of coverage also caused Head to lose the coverage it had under an excess insurance policy issued by another company.

The Nelson suit proceeded to trial before the court. In May 1992, the trial court rendered judgment in favor of Nelson against TU, and in favor of TU on its indemnity cross-claim against Head for approximately $1,889,000, which is the amount of Nelson's judgment plus TU's attorney's fees and costs. In the meantime, Head had filed suit against Maryland, Payne, and Gans & Smith in 1991, alleging wrongful denial of its claim under the commercial liability policy.

Head moved for and was granted a nonsuit without prejudice in August 1992, after entering into two settlement agreements. In the first, Nelson, TU, TU's workers' compensation carrier, and Head entered into a settlement arrangement whereby Head assigned its rights against Maryland to Nelson and guaranteed Nelson a recovery of $500,000. In exchange, Nelson promised not to execute against Head's assets.[1] In the second settlement agreement, executed by Head, TU, and Gans & Smith, Gans & Smith guaranteed $500,000 to Head. In return, Head promised to hold Gans & Smith harmless as to any amounts in excess of $500,000

and to indemnify Gans & Smith as to any claims brought against it by Maryland. Head then refiled suit against Maryland and dropped Payne and Gans & Smith from the case. Maryland, asserting that its agent had breached its fiduciary duties as well as the agency agreement, brought Gans & Smith back into the suit as a third-party defendant.

In a deposition in April 1993, Payne testified about the clerical error and promises of contractual liability coverage made to Head. At trial, some three years after the denial of coverage, Maryland admitted that Head's claim should have been honored and represented to the court and jury that it was willing to pay the policy benefits. The trial court found that contractual liability coverage existed as a matter of law and did not submit the coverage issue to the jury.

The jury found that Maryland had engaged in various unfair or deceptive acts in violation of the Insurance Code, but had not acted knowingly.[2] The jury awarded Head actual damages of $1,800,000. The jury found that Gans & Smith had not breached any fiduciary duty owed to Maryland and had not breached its agency contract with Maryland.

The trial court rendered judgment against Maryland for Head's actual damages plus defense costs that Head incurred in TU's cross-action in the Nelson suit. The trial court also imposed a statutory penalty under

---

1. This settlement agreement was never offered in evidence.

2. The multi-part liability question and its answers are as follows:

 **QUESTION NO. 1**

 Did Maryland Insurance Company engage in any unfair or deceptive act or practice?

 "Unfair or deceptive act or practice" means any of the following:

 1. Engaging in any false, misleading, or deceptive acts or practices.
 . . . .
 Answer "Yes" or "No."
 ANSWER: No

 2. Not attempting in good faith to effectuate a prompt, fair, and equitable settlement of a claim when liability has become reasonably clear.
 Answer "Yes" or "No."
 ANSWER: Yes

 3. Failing to process a claim in good faith.
 Answer "Yes" or "No."
 ANSWER: Yes

 4. Failing to promptly and equitably pay a claim when liability becomes reasonably clear.
 Answer "Yes" or "No."
 ANSWER: No

 5. Failing to comply with its duty of good faith and fair dealing to Head Industrial Coatings & Services, Inc.
 A party fails to comply with its duty of good faith and fair dealing when—without a reasonable basis, it denies a claim, and it knew or should have known, based on its duty to thoroughly investigate claims, that there was no reasonable basis for the denial.
 Answer "Yes" or "No."
 ANSWER: Yes

Article 21.55 of the Insurance Code.[3] A take-nothing judgment was rendered against Maryland in its third-party action.

## VIABILITY OF A CAUSE OF ACTION

■ Maryland contends that the trial court erred in rendering judgment on the jury's finding that it failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claim against its insured because allegations of unfair claims settlement practices do not give rise to a private cause of action. The jury question was based on Article 21.21–2 of the Insurance Code, which regulates claims settlement practices. *See* TEX.INS.CODE ANN. art. 21.21–2 (Vernon 1981 & Supp.1995).

The Texas Supreme Court has expressly held that Article 21.21–2 is subject to enforcement only by the State Board of Insurance and does not give rise to a private cause of action. *See American Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842, 847 & nn. 10–11 (Tex.1994); *Allstate Ins. Co. v. Watson,* 876 S.W.2d 145, 148 & n. 6 (Tex.1994); *see also CNA Ins. Co. v. Scheffey,* 828 S.W.2d 785, 791 (Tex.App.—Texarkana 1992, writ denied). Head Industrial concedes this point in its brief. This point of error is sustained.

Maryland also challenges the existence of a cause of action under the Insurance Code for an insurance carrier's failure to process a claim in good faith and breach of the duty of good faith and fair dealing. Maryland cites *Watson,* 876 S.W.2d 145. In *Watson,* the Texas Supreme Court ruled that third parties do not have standing to proceed directly against an insurance company under Section 16 of Article 21.21 of the Insurance Code for unfair claims settlement practices. *Id.* at 150. The court emphasized that its decision in *Vail*[4] was predicated upon the special insurer-insured relationship. *Id.* at 149. The court reaffirmed *Vail* as the law governing claims for alleged unfair claims settlement practices brought by insureds against their insurers, but determined that a third-party claimant has no basis for demanding the extracontractual obligations imposed on insurers under Article 21.21 with regard to their insureds. *Id.* Unlike the *Watson* situation, Head Industrial is the named insured in the policy issued to it by Maryland.[5]

■ Through Board Order 18663, promulgated by the State Board of Insurance, conduct determined pursuant to law to be an unfair or deceptive act or practice in the insurance business is actionable under Article 21.21 of the Insurance Code. *See* 28 TEX.ADMIN.CODE § 21.3 (West 1994) (State Bd. of Ins.); *see also* TEX.INS.CODE ANN. art. 21.21, § 16 (Vernon Supp.1995) (making actionable any conduct defined in Board rules or regulation as unfair or deceptive). The Texas Supreme Court has held that an insurer's failure to deal fairly and in good faith with its insured—a determination that encompasses an insurer's lack of good faith in processing a claim—is an unfair or deceptive act. *See Vail v. Texas Farm Bureau Ins. Co.,* 754 S.W.2d 129, 135 (Tex.1988); *Aranda v. Insurance Co. of N.Am.,* 748 S.W.2d 210 (Tex.1988); *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165 (Tex.1987). This holding is a determination pursuant to law, thus making the issue of an insurer's bad faith actionable under the Insurance Code. *Vail,* 754 S.W.2d at 135.

In the recent case of *Texas Farmers Insurance Company v. Soriano,* the Texas Supreme Court stated that it had never recognized a cause of action for a breach of the duty of good faith and fair dealing when the insurer failed to settle third-party claims against its insured. *Texas Farmers Ins. Co. v. Soriano,* 881 S.W.2d 312 (Tex.1994). It observes that this standard of care owed by

---

3. TEX.INS.CODE ANN. art. 21.55, *amended by* Act of May 27, 1991, 72nd Leg., ch. 242, § 11.03(a), 1991 Tex.Gen.Laws 1043.

4. *Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d 129 (Tex.1988).

5. We disagree with the dissent because this is not a case of unfair claims settlement practices, because our determination does not allow us to find errors and provide relief not preserved and requested in the trial court, and because neither this court nor the trial court participated in fraud upon the judicial system. The dissent's effort to stretch *Watson* beyond its holding is surprising in light of his article, Charles Bleil & Susan Bleil, *Sorry, Ms. Watson,* 28 TRIAL LAWYERS FORUM 5 (1994).

insurers to the insureds was in suits involving first-party claims. *Id.* at 317 (citing *Arnold,* 725 S.W.2d at 167). This is dicta in the *Soriano* case because it was not raised on appeal. *See id.*

If there is no breach of duty, then there can in turn be no statutory claim for unfair or deceptive acts based on that breach of duty. But to hold that a duty extends only to an insured under first-party policies is incomprehensible. The duty of good faith and fair dealing is premised both on the special relationship between an insured and his insurer and on the fact that the insurance company has exclusive control over the evaluation, processing, and denial of claims. *Arnold,* 725 S.W.2d at 167. It is illogical to say that an insurer who has a contract with its insured and has the same exclusive control over processing a claim does not owe a good faith duty to its insured merely because the policy is one covering the insured's liability to others.

The special relationship that underlies the *Arnold, Aranda,* and *Vail* decisions, as recognized and reaffirmed in the *Watson* decision, exists in the present case despite the fact that the underlying policy provides liability coverage. This Court has recently stated it will continue to follow *Vail* "until the Texas Supreme Court tells us that it is not to be followed in a case involving an insured." *Crum & Forster, Inc. v. Monsanto Co.,* 887 S.W.2d 103 (Tex.App.—Texarkana 1994, no writ). We concluded in the *Monsanto* case that the Supreme Court had not closed the door to suits under the Insurance Code in cases dealing with an insured as in the case of *Vail.* Because there is a special relationship between an insured and insurer, the court will follow *Vail* and hold that the breach of the duty of good faith and fair dealing owed to an insured, even as in this case one covered by a liability policy, can constitute an unfair or deceptive act or practice pursuant to law and can subject a carrier

to liability under Article 21.21 of the Insurance Code. This point of error is overruled.

## BAD FAITH

Maryland contends that there is no evidence or factually insufficient evidence to support the jury finding that it engaged in unfair or deceptive acts or practices by failing to process a claim in good faith and failing to comply with its duty of good faith and fair dealing to Head. In reviewing a no evidence point, the reviewing court considers only the evidence supporting the jury's findings and disregards all contrary evidence and inferences. *National Union Fire Ins. v. Dominguez,* 873 S.W.2d 373, 376 (Tex.1994). If there is any evidence of probative force to support the finding, the point is overruled and the finding upheld. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). When reviewing the factual sufficiency of the evidence to support the jury's verdict, we examine all of the evidence and set aside the verdict only if it is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

To establish a bad faith cause of action, the plaintiff must show that there was no reasonable basis for the denial of or delay in processing his claim and must further show that the carrier knew or should have known that fact.[6] *Union Bankers Ins. Co. v. Shelton,* 889 S.W.2d 278 (Tex.1994); *Aranda,* 748 S.W.2d at 213. Reviewing the legal sufficiency of the evidence to support a bad faith claim presents the appellate courts with a "conundrum" in that the record must be reviewed for no evidence of a negative fact— the absence of a reasonable basis for the insurer's denial of the claim or delay in payment or processing. *Lyons v. Millers Casualty Ins. Co. of Texas,* 866 S.W.2d 597, 600 (Tex.1993); *see also Dominguez,* 873 S.W.2d at 376.

6. Although the bad faith claims were presented as specific types of unfair or deceptive conduct, they involve the same two-prong predicate for recovery as the common-law tort action. *See Emmert v. Progressive County Mut. Ins. Co.,* 882 S.W.2d 32, 36 (Tex.App.—Tyler 1994, writ denied); *State Farm Lloyds, Inc. v. Polasek,* 847 S.W.2d 279, 282 n. 2 (Tex.App.—San Antonio 1992, writ denied); *see also State Farm Lloyds Ins. Co. v. Maldonado,* No. 04–93–00046–CV, slip op. at 8–9, 1994 WL 498682 (Tex.App.—San Antonio Sept. 14, 1994, n.w.h.).

■ Gans & Smith told Head that contractual liability insurance was part of its policy and continued to make such assurances to Head after Nelson filed suit and TU filed its cross-action. The trial court held that the facts established as a matter of law that coverage for contractual indemnity existed. The issue of bad faith, however, focuses on the reasonableness of the insurer's conduct and not on the validity of the claim. *Lyons,* 866 S.W.2d at 601. The evidence adduced by the plaintiff in support of a bad faith action must relate to the tort issue of no reasonable basis for the insurer's conduct, not just to the contract issue of coverage. *Id.* at 600; *see also Dominguez,* 873 S.W.2d at 376.

■ A great distinction exists between an insurer's contractual liability under the policy and a claim of bad faith regarding delay or denial of a claim under the policy. *See Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 17 (Tex.1994); *Lyons,* 866 S.W.2d at 600–01. Carriers retain the right to deny invalid or questionable claims and will not be subject to liability for acting in bad faith merely because the denial of such a claim is eventually determined to be erroneous. *Aranda,* 748 S.W.2d at 213. If an insurer denies what is later determined to be a valid claim under a contract of insurance, the insurer must respond in actual damages up to the policy limits; however, as long as an insurer has a reasonable basis to deny or delay payment of the claim, even if that basis is eventually determined to be erroneous, the insurer is not liable for the tort of bad faith. *Lyons,* 866 S.W.2d at 600.

■ The first element of a bad faith action, the absence of a reasonable basis, requires an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the policy benefits. *Dominguez,* 873 S.W.2d at 376. Whether a reasonable basis exists is judged by the facts before the insurer at the time the claim was denied. *Viles v. Security Nat'l Ins. Co.,* 788 S.W.2d 566, 567 (Tex. 1990). To be legally sufficient, the evidence, when viewed in the light most favorable to the verdict, must be such as to permit the logical inference that the insurer had no reasonable basis to deny or delay paying the claim and knew or should have known that fact. *Lyons,* 866 S.W.2d at 600. Only after an appellate court has determined what potential basis an insurance company had for denying a claim can the court then conduct a meaningful review of the evidence. *Dominguez,* 873 S.W.2d at 377.

■ From the outset, Maryland challenged the contractual liability claim because the policy, as issued, did not provide coverage for that type of claim. In fact, the policy issued expressly denies that such coverage is provided. Payne's error in not including the requested endorsement is undisputed, but this became more than a clerical error when Payne did nothing to correct the error. The adjuster, even though notified of Head's contentions, never asked Payne if there had been an error in issuing the policy.

A carrier is liable to the insured for acts of its agents that breach a duty of good faith and fair dealing. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695 (Tex.1994). Payne's silence was tantamount to misrepresentation, because he was aware that coverage was being denied because of his failure to correct his error. Knowing misrepresentation by an agent meets the "knowingly" requirements of the DTPA and Insurance Code. *Underwriters Life Ins. Co. v. Cobb,* 746 S.W.2d 810 (Tex.App.—Corpus Christi 1988, no writ); *see also Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96 (Tex.1994). The evidence shows that Maryland knew or should have known that there was no reasonable basis for denying coverage. These points of error are overruled.

## KNOWING CONDUCT

Head contends that the agent's admitted knowledge constituted corporate knowledge as a matter of law, which would entitle Head to additional damages under the Insurance Code. Thus, Head contends that the jury's failure to find that the conduct was done knowingly was a nullity, and Head had requested the trial court to ignore this jury finding and to enter such a finding as a matter of law. Head contends that the trial court erred in Jury Question 2, which asked if Maryland engaged in conduct knowingly,

by failing to give the requested instruction and by not submitting such an instruction in any form. Maryland responds that just because the agent knew did not mean that its conduct was done knowingly by the corporation.

A corporation is a legal fiction and can act only through its agents. *Underwriters Life Ins. Co. v. Cobb*, 746 S.W.2d at 821. The general rule of agency law is that notice to an agent, when the agent is acting within the scope of his authority with respect to a matter over which his authority extends, constitutes notice to the principal. *Southern Farm Bureau Casualty Ins. Co. v. Allen*, 388 F.2d 126 (5th Cir.1967); *University State Bank v. Gifford–Hill Concrete Corp.*, 431 S.W.2d 561 (Tex.Civ.App.—Fort Worth 1968, writ ref'd n.r.e.). The knowledge of the agent is the knowledge of the company itself. *Traders & General Ins. Co. v. Lucas*, 281 S.W.2d 188 (Tex.Civ.App.—Galveston 1955, writ ref'd n.r.e.). The test is whether the agent was acting within the scope of the agency relationship, not whether the principal authorized the specific wrongful act. *Celtic Life Ins. Co.*, 885 S.W.2d at 99.

Head requested an instruction on the doctrine of imputed knowledge [7] in connection with Jury Question 2, in which the jury was asked to decide if Maryland engaged in its wrongful conduct knowingly. Head asked that the jury be instructed that knowledge by its agent would be imputed to Maryland.

The jury was instructed that *knowingly* means "actual awareness of the falsity, deception, or unfairness of the conduct in question. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness." This instruction follows the definition of knowingly set out in both the DTPA and the Insurance Code. *See* TEX.BUS. & COM.CODE ANN. § 17.45(9) (Vernon 1987); TEX.INS.CODE ANN. art. 21.21, § 2 (Vernon Supp.1995). An instruction on agency may have been appropriate, but it would not contain the lengthy wording requested by Head and should contain a limitation of "knowledge within the scope of the agency."

At trial, Maryland took the position that the requested imputed-knowledge instruction conflicted with the statutory definition of *knowingly*. In *State Farm Fire & Casualty Company v. Gros*, the court was dealing with the same definition of *knowingly*, but found that the knowledge of its agent was attributable to State Farm Insurance Company. *State Farm Fire & Casualty Co. v. Gros*, 818 S.W.2d 908 (Tex.App.—Austin 1991, no writ). In the case of *La Sara Grain Company v. First National Bank of Mercedes*, the Texas Supreme Court held that a corporation is bound by the knowledge of its agent if that knowledge came to him in the course of the agent's employment. *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558 (Tex.1984). This determination was made in showing that the bank was not acting in good faith. The Commission of Appeals set forth in *Mays v. First State Bank of Keller* the well-settled rule of law in Texas which charges the principal with knowledge possessed by the agent in those cases in which the officer or agent is the sole representative of a corporation in the transaction

---

7. The requested instruction was as follows:

You are instructed that a corporation can act only through its agents, servants or employees. A corporation is bound by its agent's acts that are expressly, apparently, or impliedly authorized by the corporation. You are further instructed that a corporation is bound by the knowledge of its agents if that knowledge came to the agent in the course of his or her employment. [Cites omitted.] An attorney hired by an insurance company to defend an insured, and attorneys hired to represent the insurance company are agents of the insurance company. [Cites omitted.]

You are further instructed that the knowledge of an agent is imputed to and binding upon the insurance company, and the insurance company is estopped by the knowledge of its agent from denying coverage. [Cites omitted.]

You are further instructed that, under Texas law, a Local Recording Agent is a person or firm engaged in soliciting and writing insurance, being authorized by an insurance company to solicit business, and to write, assign, execute and deliver policies of insurance, and to bind insurance companies on insurance risks. Knowledge of a Local Recording Agent is imputed to and binding upon the insurance company, and the insurance company is estopped by the knowledge of its Local Recording Agent from denying coverage. [Cites omitted.]

in question. *Mays v. First State Bank of Keller,* 247 S.W. 845, 846 (Tex.Comm'n App. 1923, judgm't adopted). As the Texas Supreme Court said in *Wellington Oil Company of Delaware v. Maffi,* "The rule has been announced by this court that a principal, whether a corporation or natural person, is not affected by a notice which comes to the agent or officer *unless such knowledge came to him while he was transacting the business of his principal." Wellington Oil Co. of Delaware v. Maffi,* 136 Tex. 201, 150 S.W.2d 60, 63 (1941) (emphasis added). The quotation goes on to say that if the agent is "representing his principal in the transaction to which his knowledge relates, the principal will not be permitted to avail himself of the benefits of his agent's services without being charged with his knowledge." *Id.* (citing many Texas cases).

 In the present case, Gans & Smith was the local recording agent for Maryland. Such agents are vested with authority coextensive with that of the insurer insofar as writing insurance is concerned. *Blakely v. American Employers' Ins. Co.,* 424 F.2d 728 (5th Cir.1970); *American Nat'l Life Ins. Co. v. Montgomery,* 640 S.W.2d 346 (Tex.App.—Beaumont 1982, writ ref'd n.r.e.). A local recording agent has the authority to speak and act for the company and to transact all insurance business which that company is authorized to transact under its permit from the state. *Home Ins. Co. of New York v. Roberts,* 129 Tex. 178, 100 S.W.2d 91 (1937). In *Shaller v. Commercial Standard Insurance Company,* the Texas Supreme Court said that the purpose of this section in the Insurance Code was to vest local recording agents with authority coextensive with that of the insurance company insofar as writing insurance is concerned and to remove all questions of the local agent's actual or apparent authority from the field of cavil or dispute. *Shaller v. Commercial Standard Ins. Co.,* 158 Tex. 143, 309 S.W.2d 59 (1958); *see also Royal Globe Ins. Co. v. Bar Consultants, Inc.,* 577 S.W.2d 688 (Tex.1979). The agent's knowledge is, therefore, imputed to the principal. There is no dispute in the present case that Gans & Smith was an authorized recording agent and the policy that should have been issued was within the authority of that agency. Corporations, as well as natural persons, are responsible for the knowledge possessed by those whom they appoint as agents. *Dixon v. United States Fidelity & Guar. Co.,* 293 S.W. 291 (Tex.Civ.App.—Texarkana 1926, writ dism'd). Because of the nature of a corporation, it cannot transact any business except through its agents. Because a corporation operates through individuals, privity and knowledge of individuals at a certain level of responsibility must be deemed privity and knowledge of the organization; otherwise, it could always limit its liability. *Continental Oil Co. v. Bonanza Corp.,* 706 F.2d 1365 (5th Cir.1983). Where the level of responsibility begins must be discerned from the circumstances of each case. *Id.*

 There is no dispute that Gans & Smith was an authorized recording agent for Maryland, that the policy that should have been issued was within the scope of that agent's authority, and that Payne was acting on behalf of the recording agent. There is also no dispute in the record that Payne had full knowledge of the policy that he had issued more than three years before the suit, that he had knowledge of the correct policy that he should have issued, and that he had been aware for more than three years that a claim had been denied under the erroneous policy. These factors being undisputed and uncontested, Head was entitled to a determination as a matter of law that the violation of the Insurance Code had been done knowingly.

## DUE PROCESS ARGUMENT

 Maryland takes the position that civil punishment to which Head would be entitled by a determination that the conduct was done knowingly cannot be taken against a principal based solely upon vicarious or imputed knowledge or intent. It refers to the *McGuff* rule.[8] *King v. McGuff,* 149 Tex. 432,

8. "[T]he general rule prevailing in Texas may, for the purposes of this suit, be stated the same as in the Restatement, Torts, § 909, as follows:

'Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,

234 S.W.2d 403 (1950). The *McGuff* case dealt with punitive damages for malicious misconduct of a servant in a common-law negligence action. The present case deals with damages under Article 21.21, § 16(b)(1) of the Insurance Code, which specifically authorizes a recovery of three times the amount of actual damages. This recovery is not dependent on the rules of common-law negligence, but rather depends on the existence of corporate knowledge. In *State Farm Fire & Casualty Company v. Price,* State Farm argued that the procedure for assessing additional damages under the Insurance Code and the DTPA was a violation of due process and equal protection under the constitution. *State Farm Fire & Casualty Co. v. Price,* 845 S.W.2d 427 (Tex.App.— Amarillo 1992, writ dism'd by agr.). The court determined that such permissible damages under the statutes for knowing violations did not violate the due process and equal protection provisions of the constitution. We find that such a recovery in the present case does not violate Maryland's constitutional rights. This argument is overruled.

### PROXIMATE CAUSE

■ Maryland further contends that submitting the issue of breach of the duty of good faith and fair dealing as a statutory violation, instead of as a common-law tort, allowed Head to circumvent its burden to prove proximate causation to recover damages for Maryland's breach of duty. The common-law tort for breach of the duty of good faith and fair dealing requires proof that the carrier's lack of good faith proximately caused damages to the insured. *See Aranda,* 748 S.W.2d at 215. In the present case, however, the case was submitted to the jury as one involving unfair or deceptive acts

'(a) the principal authorized the doing and the manner of the act, or
'(b) the agent was unfit and the principal was reckless in employing him, or
'(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
'(d) the employer or a manager of the employer ratified or approved the act.' "
*King v. McGuff,* 149 Tex. 432, 234 S.W.2d 403, 405 (1950).

in violation of the Texas statutes, not as a common-law tort. Unfair or deceptive acts or practices in the insurance industry are governed by Article 21.21, § 16 of the Insurance Code, which permits an injured party to recover actual damages resulting from wrongful conduct. TEX.INS.CODE ANN. art. 21.21, § 16(a) (Vernon Supp.1995). In conformity with the statute, the jury was asked what damages resulted from Maryland's unfair or deceptive acts.

■ Maryland did not object to the omission of the proximate causation element prior to the charge being read to the jury. *See* TEX.R.CIV.P. 272. Failing to timely complain of the omission waives error. TEX.R.CIV.P. 274; *see also* TEX.R.CIV.P. 279; *Ramos v. Frito–Lay, Inc.,* 784 S.W.2d 667, 668 (Tex. 1990) (omitted element of ground of recovery, when not requested or objected to, deemed found in support of judgment if supported by some evidence). This point of error is overruled.

### CONFLICTING JURY FINDINGS

■ Maryland contends that the jury's findings regarding its unfair or deceptive acts are in irreconcilable conflict.[9] In reviewing jury findings for conflict, the threshold question is whether the findings are about the same material fact. *Bender v. Southern Pac. Transp. Co.,* 600 S.W.2d 257, 260 (Tex.1980). It is our duty to harmonize jury findings whenever possible. *Id.* The jury's answers cannot be struck down if there is any reasonable basis on which they can be reconciled. *Id.* Irreconcilable conflict is fatal, fundamental error requiring the judgment to be set aside. *Little Rock Furniture Mfg. Co. v. Dunn,* 148 Tex. 197, 222 S.W.2d 985, 991 (1949).

All five subparts to Question 1 constituted unfair or deceptive practices or acts under

9. Our determination that Maryland had knowledge through its agent Payne negates the jury's answer to Question 2 and therefore we do not address its potential conflicts with other answers. Because the answer to Jury Question 1(2) is not relied upon for the holding by this court, we do not address any potential conflicts (dealt with not attempting in good faith to effectuate settlement when liability became clear).

the DTPA. Jury Question 1(1) seemed general, but could be considered apart from the other specific acts or practices. Question 1(1) instructed the jury that:

> False, misleading, or deceptive act or practice" means any act or series of acts that have the tendency to deceive an average ordinary person, even though that person may have been ignorant, unthinking, or gullible.

The jury answered, "No." Maryland's deceptiveness, or lack thereof, is a different fact issue than that at issue in the other subparts of the liability question.

■ Maryland also argues that the jury's refusal to find that Maryland did not promptly and equitably pay a claim conflicts with the jury's findings that Maryland unreasonably denied a claim in breach of its duty of good faith and fair dealing and failed to process a claim in good faith. Maryland informed the jury of its willingness to accept responsibility to pay the policy benefits. From this, the jury may have believed the evidence showed that when those in charge of paying the claim found out that Payne had made a clerical error, then they, on behalf of Maryland, were willing to abide by the policy and pay the claim when the liability became clear. The jury, however, might also have reasonably believed that Maryland, had it conducted a more thorough investigation at the time it processed the claim by getting the information from its agent, could have discovered its liability earlier.

The jury's answers can be harmonized and are not in fatal conflict. These points of error are overruled.

## DAMAGES

Maryland also contends that the trial court erred by rendering judgment against Maryland based on the jury's answer to Question 3, the damages question, because there was insufficient evidence that Head sustained damages of $1,800,000 as a result of Maryland's conduct and further contends that the trial court erred as a matter of law by rendering judgment in excess of the policy limits based upon a legally improper measure of damages.

In connection with the damages question, the jury was instructed to consider only the judgment rendered in the Nelson suit. Don Nelson recovered a judgment for $1,820,-894.93 in his personal injury action, and TU recovered a judgment against Head for $1,820,894.93 plus TU's attorney's fees of $68,500.44. In the present suit, the jury found that Maryland's unfair or deceptive conduct resulted in $1,800,000 in damages to its insured.

■ The Insurance Code permits a plaintiff to recover actual damages sustained as a result of another's unfair or deceptive acts. TEX.INS.CODE ANN. art. 21.21, § 16(a). The plaintiff must prove that the damages alleged were factually caused by the defendant's unfair or deceptive conduct. *Crawford & Co. v. Garcia*, 817 S.W.2d 98, 101 (Tex.App.—El Paso 1991, writ denied); *First American Title Co. v. Prata*, 783 S.W.2d 697, 701 (Tex.App.—El Paso 1989, writ denied); *see also Izaguirre v. Texas Employers' Ins. Ass'n*, 749 S.W.2d 550, 553 (Tex.App.—Corpus Christi 1988, writ denied) (holding, in common-law bad faith suit, that damages awarded must be result of insurer's bad faith acts). Damages resulting from the underlying injury that forms the basis for the insurance claim are not a proper part of the recovery because these are not damages resulting from the insurer's misconduct. *See* TEX.INS.CODE ANN. art. 21.21, § 16(a); *Izaguirre*, 749 S.W.2d at 553. This was not a *Stowers*[10] case where it was shown that the underlying case could have been settled within the policy limits. Furthermore, there is no evidence to show that if Maryland had provided a defense the outcome of the underlying suit would have been different. The cases cited by Head to establish that the amount of the judgment in the underlying suit was the correct amount of damages are either cases in which the *Stowers* doctrine applied (there was an offer to settle within the policy limits) or cases in which the under-

---

**10.** *G.A. Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved).

lying judgment was within the policy coverage.

■ There was no evidence that Maryland's misconduct resulted in $1,800,000 in damages to Head. Head was liable to TU for the amount of the underlying personal injury judgment because of the indemnity agreement it had with TU. Even if Maryland had covered the claim, the extent of contractual liability coverage was $500,000. Head contends that Maryland's denial of the claim resulted in Head's also losing $500,000 under an excess coverage policy issued by another carrier. The excess policy was contingent on the existence of a primary policy. However, there was no showing that Head could not collect on the excess policy after establishing the existence of the primary policy. Thus, Head has not shown a loss of the excess coverage. The proper legal measure of damages was limited to the $500,000 loss on the primary policy, which Maryland has conceded, and the cost of defending the suit, which was $37,792.

■ Maryland also contends that the trial court erred in awarding Head $37,792 for its defense costs and attorney's fees incurred in the underlying lawsuit. Maryland contends that the trial court could not unilaterally award this amount to Head because a fact issue existed and Head failed to obtain a jury finding thereon.

The attorneys, at the suggestion of Head's trial counsel, agreed that the issue of those defense costs and attorney's fees on the underlying suit would be submitted to the court. An agreement that is made in open court and entered of record is enforceable. See TEX.R.CIV.P. 11. Maryland agreed to submit the issue to the trial court and cannot complain about that submission on appeal. This point of error is overruled.

### STATUTORY PENALTY

■ Maryland questions the trial court's assessment of an eighteen percent statutory penalty against Maryland under authority of Article 21.55 of the Texas Insurance Code, which provides that the penalty may be assessed when an insurer fails to comply with the article. TEX.INS.CODE ANN. art. 21.55,

§ 6 (Vernon Supp.1995). Article 21.55 imposes a duty on the insurer to promptly acknowledge and pay claims, but applies only to claims filed with the insurer on or after September 1, 1991. See Act of May 27, 1991, 72nd Leg., R.S., ch. 242, § 13.09, 1991 Tex. Gen.Laws 939, 1134. Although the statute does not define what constitutes filing a claim, the Austin Court of Appeals has held that an insured's actions in providing the insurance company with the notice specified in the policy constitutes filing a claim. *Mid–Century Ins. Co. v. Barclay*, 880 S.W.2d 807, 810 (Tex.App.—Austin 1994, writ denied).

Head's policy with Maryland requires the insured to give the company written notice containing sufficient particulars of the claim. Head asserts that the penalty provision applies because the written notice required under the policy was not satisfied until October 1991, when Maryland was served with Head's original petition. Head filed the original petition in July 1991. In February of 1990, however, TU had demanded that Head provide TU with a defense and indemnity in the Nelson action. The demand was forwarded to Maryland's claims adjuster. By May of 1990, Maryland had sent Head a letter denying contractual liability coverage under the policy and notifying Head that it would have to hire its own attorney to represent it in TU's cross-action. This all occurred more than a year before the effective date of the statute. Because Head's claim for contractual liability coverage was presented to and denied by Maryland before enactment of the statute, the trial court erred in assessing the statutory penalty against Maryland.

### MARYLAND'S THIRD–PARTY ACTION

Maryland contends that it conclusively established its third-party action against its agent, Gans & Smith, as a matter of law. The jury failed to find that Gans & Smith breached its fiduciary duty or breached the agency agreement. In the alternative, Maryland challenges the jury's negative answers as being against the great weight and preponderance of the evidence.

■ When examining the legal sufficiency of the evidence to support jury findings on which the appellant had the burden

of proof, the appellate court first examines the record for evidence to support the jury's answers and ignores all evidence to the contrary. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). If there is no evidence, the reviewing court then examines the entire record to determine if the contrary proposition is established as a matter of law. *Id.* When evaluating assertions that a jury's finding is against the great weight and preponderance of the evidence, the appellate court weighs all of the evidence and sets aside the jury's adverse finding only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d at 176.

Although Maryland has several points of error regarding the jury's failure to find that Gans & Smith breached its agency agreement, these points are not argued in Maryland's brief. Maryland does not cite to the agreement, nor does it cite to evidence to support its breach of contract allegations. The argument under these points pertains only to Maryland's allegations that Gans & Smith breached its fiduciary duties. A party does not preserve a complaint for review unless the party asserts the complaint in a point of error and supports it by argument and authorities in its brief. *See* Tex.R.App.P. 74(d), (f); *Trinity Univ. Ins. Co. v. Fidelity & Casualty Co.,* 837 S.W.2d 202, 205 (Tex. App.—Dallas 1992, no writ); *Kimmell v. Burnet County Appraisal Dist.,* 835 S.W.2d 108, 109 (Tex.App.—Austin 1992, writ dism'd w.o.j.) (per curiam). We overrule Maryland's points concerning the agency agreement and instead turn our attention to the jury's failure to find that Gans & Smith breached its fiduciary duty.

Inherent in any agency relationship is the fiduciary duty owed by an agent to his principal. *Hartford Casualty Ins. Co. v. Walker County Agency, Inc.,* 808 S.W.2d 681, 687 (Tex.App.—Corpus Christi 1991, no writ); *Republic Bankers Life Ins. Co. v. Wood,* 792 S.W.2d 768, 778 (Tex.App.—Fort Worth 1990, writ denied). One occupying a fiduciary relationship to another must measure his conduct by high equitable standards, not by the standards required in dealings

between ordinary parties. *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 514 (1942).

Fundamental agency law requires that the agent is bound to disclose to his principal all material facts coming to his knowledge which affect the transaction upon which he represents the principal. *City of Fort Worth v. Pippen,* 439 S.W.2d 660, 665 (Tex.1969); *Crane v. Colonial Holding Corp.,* 57 S.W.2d 316, 320 (Tex.Civ.App.—Amarillo 1933, no writ); *see generally* 3 Tex.Jur.3d *Agency* § 119 (1980). An insurance agent is liable when he breaches the fiduciary duty he owes the insurer under an agency contract. *American Indem. Co. v. Baumgart,* 840 S.W.2d 634 (Tex.App.—Corpus Christi 1992, no writ). If an agent fails to exercise reasonable care, diligence, and judgment, as the result of which failure his principal is damaged, the agent may be held responsible for such damage sustained by the principal. *See generally* 3 Tex.Jur.3d *Agency* § 127 (1980). When the injury forming the basis for a judgment against tortfeasors results from a violation of duty that one of the tortfeasors owes to the other, the person owing the duty may be required to indemnify the other person in full for whatever damages he has been compelled to pay. *Tobin & Rooney Plastering Co. v. Giles,* 418 S.W.2d 598 (Tex.Civ. App.—Texarkana 1967, no writ).

Looking first to see if there is any evidence to support the jury's failure to find that Gans & Smith breached its fiduciary duty, we find that there is some evidence in favor of Gans & Smith by the testimony of Payne that he had tried to call Maryland several times, and on at least one occasion left word for someone at Maryland to return his call. This is some evidence that the agency did not breach its fiduciary duty.

Looking at all of the evidence to determine the great weight question, we find that Payne's testimony about his failure to notify Maryland of his error in issuing the policy was strong evidence that there was a breach of fiduciary duty. As an agent, Payne, acting on behalf of Gans & Smith, owed Maryland a duty to notify them concerning the policies that had been sold and any error in those

policies. The only evidence that Payne made an effort to notify the company was that he telephoned the adjuster and left word for the adjuster to call him back. The adjuster denies having received any information about the call. There was evidence, including Payne's admission, that Payne had failed to notify Maryland about his error, even though he was aware that Maryland was rejecting the claim on this basis. For over three years, Maryland denied coverage to Head because Payne had not informed the company of his error. Applying the standard as previously set forth, we have determined that the jury's finding that Gans & Smith did not breach its fiduciary duty was against the great weight and preponderance of the evidence.

## THE SETTLEMENT AGREEMENTS

### NO REQUESTS FOR RELIEF IN TRIAL COURT

First, for the purpose of this section and the following section, we have found no reference in the briefs or in the record to any objection made to the trial court or request for relief made to the trial court concerning the two settlement agreements, except the motions in limine and the discussion before the court asking the court to determine their legal effect upon the jury's findings. Maryland filed a motion in limine to exclude any references before the jury to the first settlement agreement involving Nelson. Head filed a motion to exclude "any suit or settlement ... related to any third-party claims arising out of the incident made the basis of this suit," "any settlement negotiations and agreements," and "reference to any assignment of claim by Head Industrial Coatings & Services, Inc. to Don Nelson." Thus, it appears that both parties asked the court to keep the first settlement agreement from being introduced before the jury. The judge granted both motions. Neither party sought to introduce the agreement or objected to the trial judge's ruling. The only place that the first settlement agreement appears in the record is as an exhibit attached to a request for admissions. It was never offered into evidence. The second agreement between Head, TU, and Gans & Smith was introduced

as a third-party defendant's exhibit, but was tendered for the court only, not for the jury. There is no indication that the trial court gave any effect to either one of these settlement agreements.

### THE SETTLEMENTS' EFFECT ON HEAD'S DAMAGES

Maryland contends that the record conclusively establishes that Head sustained no actual damages as a result of the insurance policy's failure to include a contractual liability endorsement. Maryland bases this contention on the existence of two settlement agreements entered into by Head, the first among Nelson, TU, Head, and TU's workers' compensation carrier; the second among TU, Head, and Gans & Smith.

The first settlement agreement assigns Head's rights against Maryland to Nelson with an agreement not to execute against Head's assets. There is no evidence and no allegation that the first settlement agreement and the resulting judgment was the result of fraud or collusion among the parties. Texas law has long recognized the right of assignment. The rights of the person who was a plaintiff at the time of commencement of the suit are ordinarily in issue, and a recovery by him inures to the benefit of the transferee to the extent of the plaintiff's interest. *Hearne v. Erhard*, 33 Tex. 60 (1870). In Texas, the juries are not told that the liability carrier is a party actually liable when the act of the insured is the determining factor in establishing liability. Just as in the present case, the liability is determined by litigation between the two principal parties based upon contract or other cause of action. If by agreement or assignment this liability inures to the benefit of a third party, this does not, on its face, create fraud or collusion. It, in fact, expedites the judicial process by avoiding separate trials on each step of the process. Maryland should not be absolved from liability because of this agreement not to execute on Head's assets. In fact, this agreement does not absolve Head from liability. Instead, Head guarantees that if American General is not required to pay the $500,000 policy limit, Head guaran-

tees that amount to be paid to Nelson.[11] Therefore, under this agreement Head could be liable for $500,000 and have damages in that amount unless Maryland is required to pay damages to Head in that amount. Therefore, this agreement did not absolve Head from actual damages from the failure of the insurance policy to include a contractual liability endorsement.

Maryland argues that the second settlement agreement negates any damages obtained by Head because Head is assured of being indemnified for the first $500,000 by Gans & Smith. When there is a settling defendant, this does not mean there were not damages in the transaction. This means under the one-satisfaction rule, the nonsettling defendant is entitled to receive credit on any judgment against it for amounts already recovered under settlements with other defendants. Any settlements must be applied after the trebling of actual damages when Article 21.21, § 16 of the Insurance Code is applied. *Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d 1, 9 (Tex.1991). This point of error is overruled.

MARY CARTER CONTENTIONS

In a related point of error, Maryland contends that this lawsuit, verdict, and judgment are the result of an illegal Mary Carter agreement, citing the Texas Supreme Court's decision in *Elbaor v. Smith*, 845 S.W.2d 240 (Tex.1992).

■ A Mary Carter agreement exists when the settling defendant retains a financial stake in the plaintiff's recovery and remains a party at the trial of the case. *Elbaor*, 845 S.W.2d at 247. This occurs when the settling defendant, who remains a party, guarantees the plaintiff a minimum payment, which may be offset in whole or in part by an excess judgment recovered at trial. *Id* at

247; *see General Motors Corp. v. Simmons*, 558 S.W.2d 855, 858 (Tex.1977),[12] *overruled on other grounds by Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 427 (Tex.1984). Mary Carter agreements are void as violative of sound public policy. *Elbaor*, 845 S.W.2d at 250.

The first agreement involving Nelson was not a Mary Carter agreement. It did not involve a settling defendant retaining a financial stake in the plaintiff's recovery and remaining as a party during the trial of the case. The first agreement does not meet the requirements of a Mary Carter agreement because there was no party defendant remaining in the suit who had made a deal with the plaintiff.

■ This second agreement is more than a release. It contains specific language that Head will hold Gans & Smith harmless from any contribution or indemnity sought by Maryland. The following language is a part of that settlement agreement:

In consideration for the Agent's [Gans & Smith] covenant to defend and indemnify Head and TU Electric Defendants as more specifically described in the following paragraphs, TU Electric Defendants and Head hereby agree upon full satisfaction and release of any Judgment or Claims against TU Electric Defendants and Head growing out of or connected with this litigation or the alleged accident which is the subject of this litigation, to compromise, settle, and fully release, and forever discharge Gans & Smith Insurance Company (sic) and its employees, insurers, and representatives, as well as all other persons, firms, or organizations in privity with same, whether named herein or not, of and from any and all claims, demands, controversies, actions, or causes of action which they have held or

11. The following language appears in Section b of the settlement agreement:
 Head's financial guarantee expressed herein below that if for any reason a court of final jurisdiction shall rule that American General does not owe insurance benefits or damages to Head or TU Electric Defendants in connection with the matters referred to in this agreement and Nelson is therefore unsuccessful in recovering an amount of up to the $500,000 policy limit of American General, then Head guaran-

tees that an amount of up to $500,000, but no more, shall be paid to Nelson by Head or its representatives, to assure that Nelson's recovery in this action is not less than $500,000.

12. This case, predating *Elbaor*, held that when a settling defendant had a financial interest in the outcome of a lawsuit as a result of Mary Carter agreement, this was a proper subject for disclosure by direct evidence or cross-examination.

may now or in the future own or hold for damages, losses, costs, expenses, of any kind or nature, whether known or unknown, arising from or in any way growing out of or resulting from or to result from the injury or claim of Nelson referred to above or the lack of insurance coverage for such claim, or for any matter relating to any insurance claim involving such accident or injury.

. . . .

*... Head agrees to indemnify and hold the Agency harmless of and from any claims for contribution or indemnity which may be asserted against the Agency by American General* or any other party in connection with claims which may be filed by Nelson, TU Electric Defendants, and Head against American General or other third parties regarding the factual circumstances set forth herein. It is, however, expressly understood, that the Agency will provide its own defense and not be indemnified for legal expenses or other costs of litigation which may be incurred in connection with the defense of any such actions for contribution or indemnity.

(Emphasis added.)

Gans & Smith has strongly contended on rehearing that its guaranteed payment of $500,000 to Head was not contingent upon Head failing to recover from Maryland. In other words, Gans & Smith contends on rehearing that it was to pay the $500,000 under the agreement even if Maryland also paid the $500,000 out of the policy coverage. The following language is taken from the second settlement agreement:

In consideration for the mutual promises set forth herein, the Agency hereby agrees to provide *such insurance benefits,* including a defense and such indemnity benefits up to the amount of American General's policy limit of $500,000, including the contractual liability coverage which the parties herein stipulate were agreed to be included in the American General Fire & Casualty Insurance Policy No. GL68810122. The release set forth in this Settlement Agreement notwithstanding, it is understood that the Agency *will provide such benefits* and accept all obligations connected with such

insurance as would be applicable to any proper insurer under the prevailing statutory and common law of the state of Texas applicable at the time of the signing of this Settlement Agreement, *including settlement for the policy limits, if it appears that the financial interests of the insureds Head and TU Electric Defendants require protection by such settlement* and if the Plaintiff will accept such settlement.

(Emphasis added.)

The argument by Gans & Smith that the payment of $500,000 to Head was not contingent upon whether Maryland paid the $500,000 out of policy coverage is not consistent with the position that Gans & Smith took initially in its brief in this cause of action. In its brief, Gans & Smith stated as follows:

In the aggregate, these agreements left Gans & Smith with no exposure. The release from Head eliminated Gans & Smith's exposure to Head. Head's promise to indemnify Gans & Smith eliminated Gans & Smith's exposure to Maryland. Moreover, Maryland agreed not to seek indemnity from Gans & Smith for the first $500,000. Gans & Smith's only other exposure is the promise to step into Maryland's shoes and provide $500,000 in contractual-liability coverage. *But by agreeing to fill its own shoes and provide this coverage, Maryland relieved Gans & Smith of this obligation.*

(Emphasis added.)

Whether Gans & Smith's guarantee of the $500,000 to Head is contingent upon whether Maryland pays the $500,000 on the insurance is ambiguous in the settlement agreement.

The second settlement agreement differs from a standard Mary Carter agreement because the defendant, Gans & Smith, was dismissed by the plaintiff as a defendant in the lawsuit. Maryland, however, had no choice to protect its interest but to bring Gans & Smith back into the suit by a third-party claim cross-action. In *Bristol–Myers Co. v. Gonzales,* the Texas Supreme Court found that it was not a valid distinction from other Mary Carter cases that the plaintiff had taken a nonsuit against the settling defendant and that the settling defendant re-

mained a party in the case only by virtue of a nonsettling defendant's plea for indemnity and contribution. 561 S.W.2d 801, 805 (Tex. 1978).

Maryland complains because the trial court did not declare this agreement void, but the trial court was never asked to do so. During arguments on the motions for judgment, counsel for Maryland stated that,

These two are in bed with each other. They were in bed with each other from the time they settled with each other, so the fact that this party supports the view of that party, it might have to do with their view of truth and justice, or it might have to do with their settlement agreement, so I would like to place that in at least proper context.

The Supreme Court in *Elbaor* requires the complaining party on appeal to have preserved the error. 845 S.W.2d at 251. The parties put the agreements before the court for a ruling only for the legal effect of the settlement agreements on the final judgment. They did not ask that it be declared void. The following statements were made to the court:

MR. DUNN [attorney for Head]: And then the right, in the event that Maryland Insurance Company should obtain a finding, or depending upon what the findings by the jury are, the right of release and/or extinguishment between the Gans and Smith and Head is going to be submitted to the Court for the Court to determine the legal effect of those jury issues on whatever judgment that I get against Maryland Insurance Company and whatever issues that they get answered by the jury on their claim against Gans and Smith. . . . In effect, that cross-claim and the effect of our agreement with them as to what extent that is released and what amount, will be an issue that will be submitted to the Court.

MR. MCREA [attorney for Maryland]: . . . Maryland Casualty has posed as *an affirmative defense that same settlement agreement, asserting that to the extent*

*there is an obligation for Head to indemnify Gans and Smith, that Head's claims against Maryland are extinguished in the same amount.*

(Emphasis added.) Thus, the parties requested the trial court to rule on the effect of the settlement agreement on the final judgment in the case in the event that Gans & Smith was found liable to Maryland, but Maryland did not ask the court to hold the settlement agreement void.

Maryland cannot now have the entire judgment declared void on the basis that the settlement agreements were a taint to the proceeding because Maryland did not seek such a relief in the trial court. The first request to declare the settlement agreements void was made on appeal, which was too late for the relief sought. This did not preserve the error as required in *Elbaor.* This point of error is overruled. The application of the settlement agreement as an offset will be determined on remand dependent upon the outcome of the third-party action of Maryland against Gans & Smith.[13]

## POSTJUDGMENT INTEREST

▮ Maryland questions the trial court's award of postjudgment interest at a variable interest rate rather than a fixed rate. To award postjudgment interest at a rate that varies from month to month is at odds with the language of the statute governing postjudgment interest, which requires that the judgment state the rate of interest to be earned on the judgment and also provides for annual compounding. TEX.REV.CIV.STAT.ANN. art. 5069–1.05, §§ 2, 3(b) (Vernon Supp.1995). The trial court erred in awarding interest at a variable rate.

The judgment is reformed to provide for the accrual of postjudgment interest at the fixed rate of 10%, compounded annually. TEX.REV.CIV.STAT.ANN. art. 5069–1.05, §§ 2, 3(a) (Vernon Supp.1995).

A part of Head's damage was the prejudgment interest on $500,000 in the underlying lawsuit, which began accruing November 10,

---

**13.** If Gans & Smith is found liable to Maryland, then because of Head's agreement to indemnify Gans & Smith, the responsibility returns at last to Head, and Head is directed to collect from itself, which means any recovery above the policy amount becomes a nullity.

1990. This prejudgment interest ended in the underlying suit at the entry of judgment in the underlying suit May 11, 1992. The prejudgment interest in the underlying suit could only run on the $500,000 policy amount until a judgment was granted. Then, because of a special policy provision, 10% interest will run on the entire $1,889,395.37 from May 11, 1992, until the date of judgment in the present case. This is based on a provision in the insurance policy, which provides that in addition to covering the defense costs incurred in the underlying action, Maryland will be required to pay

> *all interest on the entire amount of any judgment* therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon.

(Emphasis added.)

Maryland has not paid, tendered, or deposited with the court the $500,000 policy limits; therefore, postjudgment interest on the underlying judgment accrued at the rate of 10%, compounded annually until the judgment in the present case (December 9, 1993), and it is part of the policy benefits Maryland is obligated to pay. *See* TEX.REV.CIV.STAT. ANN. art. 5069–1.05, § 2. Interest, whether labeled prejudgment or postjudgment, cannot overlap.

## ATTORNEY'S FEES

The jury also awarded Head 40% of its recovery as reasonable and necessary attorney's fees. Attorney's fees are available to a prevailing party in an Insurance Code action or contract action. TEX.INS.CODE ANN. art. 21.21, § 16 (Vernon Supp.1995); TEX.CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1986). The recoverable attorney's fees will consist of 40% of the total of Head's actual damages, which include the principal, interest, and attorney's fees on the underlying suit and double the total.

## CONCLUSION

We reverse and remand the portion of this cause involving the third-party action by Maryland against Gans & Smith for a new trial.

We reverse and remand the judgment by Head against Maryland for limited modification. The judgment for Head against Maryland will be modified by reducing the actual damages to $500,000, plus attorney's fees of $37,792, for the underlying suit, plus prejudgment interest of 10% in the underlying suit on the policy amount of $500,000 from November 10, 1990 until May 11, 1992, plus 10% interest from May 11, 1992 on $1,889,-395.37 until December 9, 1993, the date of the judgment in the present case, plus double the foregoing amounts, plus 40% of the total as attorney's fees in the present case, plus postjudgment interest on the entire amount of the judgment from the date of the judgment. In the event that Gans & Smith is found liable to Maryland, then this amount will be subtracted from Head's judgment against Maryland because Head has agreed to hold Gans & Smith harmless and indemnify it for any claim of contribution by Maryland.

BLEIL, Justice, dissenting.

This decision cries out for review and reversal by the Texas Supreme Court. The majority of this court fails to follow a number of Texas Supreme Court decisions. It scarcely notices *Elbaor v. Smith*, circumvents *Allstate Insurance Company v. Watson*, casts aside as dicta a clear pronouncement in *Texas Farmers Insurance Company v. Soriano*, and pays mere lip service to the decisions in *Union Bankers Insurance Company v. Shelton*, *National Union Fire Insurance Company v. Dominguez*, and *Lyons v. Millers Casualty Insurance Company*. And, in so doing, the majority—wittingly or not—makes this court a participant in the fraud perpetrated upon the Texas judicial system and the people of this state by these proceedings. For these reasons and for other legal errors made by the majority, I dissent.

## FRAUD ON THE JUDICIAL SYSTEM

Maryland couples challenges to the evidence supporting the damages with an assertion that the judgment results from two Mary Carter agreements leading to this legal proceeding in violation of the public policy of

Texas.[14] These contentions are therefore discussed together.

*Factual Framework*

The scheme of this judicial charade is simple. Nelson sued the TU Electric defendants for injuries he suffered in 1987. TU sought indemnity from Head in accordance with an indemnity agreement between those two parties. Head had purchased insurance through Gans & Smith Insurance Agency to cover such an occurrence, with coverage in the amount of $500,000.00 provided by Maryland Insurance Company. Because of an error on the part of Gans & Smith, the policy actually issued by Maryland did not cover the claim against Head based upon contractual liability. When a claim was presented to Maryland, it denied the claim because the policy it had issued did not cover Head's contractual liability.

While that case was proceeding, Gans & Smith realized that it had made a clerical error and had assured Head that it was covered for such losses, although the policy issued did not cover the losses. Thus, TU, Head, and Gans & Smith knew that, because Gans & Smith was Maryland's recording agent, Maryland would be legally responsible for that claim.

Then, through two agreements, Nelson settled with TU and Head, and TU, Head, and Gans & Smith settled with each other. These settlements assured Nelson of no less than a $500,000.00 recovery. Nelson covenanted not to seek execution on any judgment he might recover against TU or Head, and Nelson was assigned all causes of action that TU or Head had or might have against the insurance company. Those settlements assured Nelson at least $500,000.00, and virtually assured TU, Head, and Gans & Smith that none of them would be responsible to pay the money.

With those two settlements—appropriately called "sweetheart deals" by the lawyers—in hand, Nelson proceeded with his suit as if there was no settlement and recovered what is called a "laydown" judgment against Head for about $1,889,000.00. That was in May 1992.

In April 1993, while deposing Hermes Payne, a Gans & Smith partner, in connection with the case now on appeal, Maryland's attorney first learned that Payne had made an error when he did not bind coverage for contractual indemnity. Later that year, with most of these facts secreted from it, a jury found the "facts" in its verdict.

*Mary Carter Background*

Clandestine agreements between a plaintiff and one or more defendants in which the settling parties plan to cooperatively proceed against a remaining defendant or defendants became known as Mary Carter agreements following the 1967 case of *Booth v. Mary Carter Paint Company.*[15] Before that time, however, Mary Carter types of agreements existed and had been utilized for many years.[16] The Texas Supreme Court first addressed Mary Carter agreements in 1977, observing that those agreements tend to undermine the adversarial nature and integrity of the proceedings against the remaining defendants. *General Motors Corp. v. Simmons,* 558 S.W.2d 855, 858 (Tex.1977), *overruled on other grounds by Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984). Two years later, the court wrote that Mary Carter agreements possessed the basic vice of presenting the jury with a false and misleading picture of the interests of the parties and witnesses. *City of Houston v. Sam P. Wallace and Co.,* 585 S.W.2d 669, 674 (Tex. 1979). Nonetheless, such agreements were rampant in multi-party litigation until the Texas Supreme Court decided *Elbaor v. Smith* in 1992, in which it determined that the Mary Carter agreement before the court revealed "yet another" jury trial and verdict distorted because of the use of such an

---

**14.** The majority declines to give effect only to one of the agreements on appeal. Maj. op. at 236. The only significance of the majority's action is that the insurance agency rather than the insurance carrier may have to fund the fraud.

**15.** 202 So.2d 8 (Fla.Dist.Ct.App.1967).

**16.** *See American Transp. Co. v. Central Indiana Ry. Co.,* 255 Ind. 319, 264 N.E.2d 64, 67 (1970) (as of 1970 such agreements had been used by railroads for at least thirty years to induce plaintiffs to proceed against railroads' joint tortfeasors).

agreement; the court then declared Mary Carter agreements void as against public policy. *Elbaor v. Smith*, 845 S.W.2d 240, 249–50 (Tex.1992).

While Mary Carter agreements were being assailed, lawyer ingenuity and craftiness created a variety of similar types of arrangements. Examples of such arrangements include "laydown" judgments coupled with a covenant not to execute in exchange for cooperation in subsequent suits,[17] default judgments followed by an "Executory Agreement, Assignment and Covenant to Delay Execution," [18] agreed judgments against the insured of an insolvent insurer followed by an agreement to transfer (referred to by the parties to the agreement as "not a fraudulent transfer") assets of original defendant, a waiver of right by the plaintiff to pursue those assets and an assignment of the defendant's legal malpractice claim against its solvent attorney and law firm,[19] and a "sham" judgment followed by a covenant not to execute against the original defendant and an assignment of his claim against his insurer.[20]

Ultimately, any litigation-settling agreement which corrupts the judicial process and causes an uninformed or misinformed jury verdict violates sound public policy. Whatever a multi-party litigation agreement or arrangement may be labeled, be it a "Mary Carter" agreement or not, if in fact it violates the sound public policy favoring fair trials, then it should be held void.

*Application of Public Policy*

The sweetheart deals leading to the laydown Nelson judgment, and the subsequent trial of this case before a misinformed jury, result in another distorted trial and jury verdict. As in the *City of Houston v. Sam P. Wallace and Company* case, the basic vice was the presentation of a false and misleading portrayal to the jury of the real interests of the parties and witnesses. *See City of Houston*, 585 S.W.2d at 674. As in *Sim-*

*mons*, the adversarial nature and integrity of this proceeding against Maryland was undermined. *See Simmons*, 558 S.W.2d at 858. And, as in *Elbaor*, the secret settlements and laydown judgment skewed the trial process, misled the jury, and promoted collusion among nominal adversaries, leading to a less culpable, but perhaps deeper-pocketed, defendant being responsible for the full judgment. *See Elbaor*, 845 S.W.2d at 250.

Concerning the underlying Nelson judgment, this court has previously called such a judgment a sham. Speaking for a unanimous court, Chief Justice Cornelius said that, "The judgment is a sham because it is not what it is represented to be. It cannot be collected from the judgment debtor, and that was the parties' intention when the judgment was taken." *State Farm Fire & Casualty Co. v. Gandy*, 880 S.W.2d 129, 138 n. 5 (Tex.App.— Texarkana 1994, writ granted). Equally applicable here is what Chief Justice Cornelius said in *Gandy*, "the courts are being used to perpetrate and fund an untruth." *Id.* at 138.

Looking to the most recent guidance on this important public question necessarily leads to the *Elbaor v. Smith* decision as well as the court of appeals' decision in *Zuniga v. Groce, Locke & Hebdon*. In *Elbaor*, the Texas Supreme Court found that settlement arrangements that skew the trial process, mislead the jury, promote unethical collusion among nominal adversaries, and create the likelihood that a less culpable defendant will be responsible for the full judgment, violate the public policy favoring fair trials. *Elbaor*, 845 S.W.2d at 250. As previously noted, the present arrangement is violative of this public policy favoring fair trials. In *Zuniga*, the San Antonio Court of Appeals dealt with a personal injury suit against an insolvent defendant, followed by an assignment from the defendant to the plaintiff of the legal malpractice claim against the defendant's lawyer. *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313 (Tex.App.—San Antonio 1994,

17. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515 (Tex.1988); *Garcia v. American Physicians Ins. Exch.*, 812 S.W.2d 25 (Tex.App.—San Antonio 1991), *rev'd*, 876 S.W.2d 842 (Tex.1994).

18. *Wheelways Ins. Co. v. Hodges*, 872 S.W.2d 776 (Tex.App.—Texarkana 1994, no writ).

19. *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313 (Tex.App.—San Antonio 1994, writ ref'd).

20. *State Farm Fire & Casualty Co. v. Gandy*, 880 S.W.2d 129 (Tex.App.—Texarkana 1994, writ granted).

writ ref'd). Justice Peeples said that the costs of this arrangement were too high:

> [T]he plaintiff would be able to drive a wedge between the defense attorney and his client by creating a conflict of interest; in time, it would become increasingly risky to represent the underinsured, judgment-proof defendant; and the malpractice case would cause a reversal of the positions taken by each set of lawyers and clients, which would embarrass and demean the legal profession.
>
> We appreciate the goals furthered by assignment, but conclude that they do not justify the detrimental impact that assignment would have on the legal system.

*Zuniga,* 878 S.W.2d at 317. Because this arrangement encouraged the notion that lawyers will take any position depending on where the money lies, and that litigation is a mere game and not a search for the truth, the court held that the assignment of a legal malpractice claim arising from litigation is invalid. *Id.* at 318.

Our case is not exactly like *Elbaor* or *Zuniga,* but for all the sound public policy reasons announced in both of those cases, this scheme of a laydown judgment against an insured, followed by an assignment of its claim of unfair claim settlement practices, among other claims, by its insurer, ought not to be validated by this court.

The majority of this court arrives at a quizzical solution concerning the fraud upon the courts. While purporting to discuss the "settlement agreements," it concludes that yes, the "second" settlement agreement violates *Elbaor,* thus this court will not enforce it. Maj. op. at 236. The first agreement, it concludes, was not offered into evidence, and was not given effect by the trial court. The majority fails to perceive the evil results produced in this case. The agreements and Nelson judgment were merely the well-placed seeds which produced the fraudulently obtained judgment which the majority upholds today. The two agreements themselves and the sham Nelson judgment are not what is wrong with these proceedings. The wrong is that the judgment now before us is patently the *result* of those clandestine agreements and the sham Nelson judgment. The net result of the majority's misperception is that the majority approves a judgment based on a charade of untruths. While purporting to partially condemn the means, the majority wholeheartedly approves the ends which the wrongful means produced.

It baffles me that this court, which quite rightly recognized the offensive nature of arrangements like these last year in *Gandy,* now gives its stamp of approval to what plainly is a fraud upon the judicial system of this state. I would hold that these proceedings, including the sweetheart deals prior to trial leading to the Nelson judgment, and the charade of untruths and half truths presented to the jury leading to this judgment, are as violative of our public policy as any can be. This scheme among Nelson, TU, Head, and Gans & Smith permitted each of them to come through the litigation whole and, without risk, proceed to a rape of the assets of the least culpable, most deep-pocketed defendant. Now the majority restores risk to Gans & Smith but otherwise keeps the scheme intact.[21] It ought not to be tolerated by this court.

*No Evidence/Insufficient Evidence*

Public policy arguments aside, this court should hold that there is no evidence of damage to Head as a result of any of Maryland's conduct. Apropos here, as in *Gandy,* are Chief Justice Cornelius' remarks:

> The amount of the judgment in a case like this, where a covenant not to execute is given contemporaneously with and as a part of a settlement and agreed judgment, cannot constitute damage to the judgment debtor. Allowing an assignee of the named judgment debtor in such a case to collect all or part of the judgment amount perpetrates a fraud on the court, because it bases the recovery on an untruth, i.e., that the judgment debtor may have to pay the judgment. *See Whatley v. City of*

---

21. The majority of this court allows Nelson and Head to reap the full benefits of the ill-gotten judgment, but it takes a tougher stance against the insurer and the insurance agency. It directs that they fight it out in yet another judicial proceeding to see which one must pay the judgment in an amount of almost four times the policy limits.

*Dallas,* 758 S.W.2d 301 (Tex.App.—Dallas 1988, writ denied); *Garcia v. American Physicians Ins. Exch.,* 812 S.W.2d 25 (Tex. App.—San Antonio 1991) (Peoples (sic), J. dissenting), *rev'd,* 876 S.W.2d 842 (Tex. 1994). Such a result should be against public policy, because it allows, as here, parties to take a sham judgment by agreement, without any trial or evidence concerning the merits, and then collect all or a part of that judgment from a third party. Allowing recovery in such a case encourages fraud and collusion and corrupts the judicial process by basing the recovery on a fiction.

*Gandy,* 880 S.W.2d at 138.

In *Gandy,* we reluctantly concluded that the current status of the law was that, in a situation like this, the underlying or laydown judgment might be some evidence of damage.[22] *Id.* However, our position was consistent with a pronouncement by the Texas Supreme Court in the original opinion in *Garcia,* although that opinion was later withdrawn. Because the Texas Supreme Court declined to determine whether a judgment is some evidence of damages in the final *Garcia* decision, and because under the facts now before us Head has not been damaged whatsoever by the judgment, I would hold that the laydown judgment here is no evidence of damage to Head.

If the majority would not join in holding that there is no evidence of damage to Head and believed that the underlying judgment might be some evidence of damage to Head, this court should proceed to show that in reality Head was not damaged at all because of its secret agreements with Nelson, TU, and Gans & Smith. In that event, this court should proceed to find the evidence of dam-

age to Head to be wholly insufficient, setting forth in detail all of the evidence why it is insufficient, as required by *Pool v. Ford Motor Company.*[23]

## CIRCUMVENTION OF *WATSON*

This court was recently accused of rejecting the Texas Supreme Court's opinion in *Allstate Insurance Company v. Watson.* Concerning our recent decision in *Crum & Forster, Inc. v. Monsanto Co.,* 887 S.W.2d 103 (Tex.App.—Texarkana 1994, no writ), and our view of *Watson* as expressed therein it was urged that,

> This open disdain of the Court's analysis in *Watson* led the appellate court to construct improper and circuitous theories to avoid the result required by *Watson.* Much of the remaining opinion can best be viewed through that prism of hostility to the outcome compelled by a proper application of the holding in *Watson.*[24]

These remarks were off the mark in that context, but seem on target now.

Whatever the reasons behind the majority's decision in this appeal, the decision does one thing if nothing else: it circumvents the results mandated by *Watson.* In pertinent part, the supreme court held that Watson, a third-party claimant against Allstate's insured, lacked standing under section 16 of article 21.21 to sue Allstate directly for unfair claim settlement practices. *Allstate Ins. Co. v. Watson,* 876 S.W.2d 145, 150 (Tex.1994). This holding is clear.

Applying the *Watson* holding to the facts of the case now on appeal, Nelson is the injured third-party claimant; Head is the insured. In the proceedings leading to the

---

22. Although the supreme court originally held in *Garcia* that the amount of judgment was no evidence of damage, in its ultimate opinion it expressly declined to rule on the question whether a pretrial nonexecution agreement negated all damages from the amount of the judgment. *American Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842, 843 (Tex.1994). The damages, in reality, from such judgments are nonexistent. If the lawyer representing the party against whom the judgment was taken—like Head in these proceedings—held up the judgment before the jury and said, "Look how we have been damaged," he would surely look away from the jury and

wink at the other lawyers aligned with him or perhaps whisper, "Ha! Ha!" to them. In truth, the lawyers and judge know these are "Ha! Ha!" damages, or fictional damages. But the jury is not given the facts.

23. *Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex. 1986).

24. Application for writ of error, *Crum & Forster, Inc. v. Monsanto Co.,* filed in the Court of Appeals, Sixth District, Mar. 3, 1995, p. 6 (filed just before settlement of the case).

sham judgment, Nelson sued TU and Head. Head requested that Maryland provide coverage and a defense, which was denied. Head then established with Gans & Smith that, through the latter's error, no coverage was provided in the policy, but that it should have been because Gans & Smith had made an error and was a local recording agent of Maryland.

As a part of the Nelson–TU–Head settlement, Nelson covenanted not to execute on any judgment he recovered against TU or Head. In return, Nelson was *assigned* any and all claims against the insurance company belonging to Head or TU. Then this bad faith suit by Head was instituted, for the benefit of Nelson, he being Head's assignee of the cause of action.

Under *Watson,* Nelson could not bring such an action against Maryland—a third-party claimant cannot bring a claim against an insurer. The scheme arrived at by these parties, however, allows Head to proceed on behalf of Nelson (assignee of all of Head's rights against Maryland), although the law of Texas forbids such a suit by Nelson. This court should not allow a scheme which plainly circumvents the law as pronounced in a decision of our Texas Supreme Court.[25]

## VIABILITY OF CAUSE OF ACTION FOR BREACH OF DUTY OF GOOD FAITH & FAIR DEALING IN THIS CONTEXT

The major question presented in this section of Maryland's appeal concerns whether a cause of action exists against an insurer under section 16 of article 21.21 and focuses on the meaning of the *Watson–Vail*[26]*–Arnold*[27] decisions taken together, as discussed by the majority. The majority notes that we have affirmed that we will follow *Vail* "until the Texas Supreme Court tells us that it is not to be followed in a case involving an insured." Majority op. at 226 (citing *Crum & Forster,*

*Inc. v. Monsanto Co.,* 887 S.W.2d at 118). I acknowledge that the *Watson* decision may seem perplexing insofar as it appears, on the one hand, to restrict the broad holding in *Vail* yet, on the other hand, professes that *Vail* remains the law concerning claims for unfair claim settlement practices brought by insureds against their insurers. *Watson,* 876 S.W.2d at 149.

The claim in this case is not clearly a *Watson* claim, with a third-party claimant versus an insurer, nor is it a first-party *Vail* claim, with a "special relationship" between an insurer and its insured, because the insured has long since terminated the "special relationship," if any, and assigned its right against the insurer to the third-party claimant. Nor is it like *Vail* for the reasons set forth in the *Garcia* and *Soriano* decisions of the Texas Supreme Court, as discussed, infra.

With this in mind, we might ask whether the Texas Supreme Court has spoken to us about our dilemma and we just were not listening. In the *Watson* decision itself, the supreme court expressed its displeasure with the notion that, in attempting to settle claims pursuant to the demands of a third-party claimant, the insurer may be liable to the insured for settling too quickly. *Watson,* 876 S.W.2d at 150 (referring to *Texas Farmers Ins. Co. v. Soriano,* 844 S.W.2d 808 (Tex. App.—San Antonio 1992), *rev'd,* 881 S.W.2d 312 (Tex.1994)).

Later in its decision in *Soriano,* the supreme court spoke to whether a cause of action for breach of the duty of good faith and fair dealing exists against an insurer when it fails to settle third-party claims against its insured. Justice Enoch, speaking for the court, wrote the following:

> At the outset, we note that this Court has never recognized a cause of action for breach of the duty of good faith and fair

---

**25.** The majority summarily disagrees with my view that today's decision circumvents *Watson.* It says that, after all, "Head Industrial is the named insured" (maj. op. at 225), wholly failing to address the notion that, because Head has assigned its rights to Nelson, the effect of these proceedings is to allow Nelson to proceed directly against Maryland, albeit via assignment.

**26.** *Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d 129 (Tex.1988).

**27.** *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165 (Tex.1987).

dealing where the insurer fails to settle third-party claims against its insured. We first articulated the standard of care owed by insurers to their insureds in responding to claims made by the insured in *Arnold v. National County Mutual Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1988). Under *Arnold*, an insurer may breach its duty of good faith and fair dealing in refusing to pay a first-party claim where (1) the insurer has no reasonable basis for denying or delaying payment of the claim or (2) the insurer knew or should have known that there was no reasonable basis for denying or delaying payment of the claim. *Id*. We reiterated an insurer's duty of good faith and fair dealing to its insured in *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 213 (Tex.1988), and most recently in *Lyons v. Millers Casualty Ins. Co.*, 866 S.W.2d 597, 599 (Tex.1993). Significantly, each of these cases involves the insurer's duty to its insured in handling first-party claims. We have never held and do *not* hold today that either of these two standards applies to insurers in responding to third-party claims.

*Soriano*, 881 S.W.2d at 317. Having thus spoken, the court then acknowledged that that particular issue was not before it and did not decide the question. *Id*.

Shortly after it wrote in *Soriano*, the supreme court again noticed a distinction between the *Vail* first-party bad faith standard and *Stowers*[28] third-party failure to settle cases. It wrote:

> We express no opinion concerning the difference between the requirement of "good faith" in "attempting" settlement under TEX.INS.CODE ANN. art. 21.21–2, § 2(b)(4), and the common law standard of ordinary care concerning a third-party liability in-

surer's attempts to settle a covered lawsuit. *Compare Stowers*, 15 S.W.2d at 547 *and Ranger County Mut. Ins. Co. v. Guin*, 723 S.W.2d 656, 659 (Tex.1987) (third-party ordinary care standard) *with Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987) *and Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex.1988) (first-party "bad faith" standard).

*Garcia*, 876 S.W.2d at 847 n. 11.

Of course, this court is correct that on some unclear issues we must stand firm and await guidance from higher courts. *Monsanto*, 887 S.W.2d at 118. However, it seems that perhaps the supreme court has been sending signals which we have tuned out. When we were first considering *Monsanto*, the messages from the Texas Supreme Court had not been sent. While *Monsanto* was submitted to this court but not decided, the Texas Supreme Court in fact did address this question. We were apparently unaware of what was said in *Soriano* and *Garcia* when *Monsanto* was decided, because neither decision is mentioned in our opinion.[29] Now, being aware of the supreme court's guidance, we should not rigidly adhere to a pronouncement just because we previously made it.[30] Whatever the Texas Supreme Court did not hold in *Soriano* or *Garcia*, it has said one thing loudly and clearly: claims by an insured against an insurer in a first-party (*Vail*) context are different than those in a third-party context (*Garcia–Soriano*). It appears that the Texas Supreme Court will hold, in an appropriate case involving a third-party claimant, an insured and an insurer, that the insured has no claim for the breach of the duty of good faith and fair dealing against the insurer. If any case ever could be the appropriate case, this is that case.

---

**28.** *G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved).

**29.** As a member of the court in *Monsanto*, I candidly concede that I was unaware of the Texas Supreme Court's *Soriano* and *Garcia* counsel on this legal question when we made the statement in *Monsanto* quoted by the majority. Majority op. at 226. I can only assume that the

majority also was unaware of this counsel at that time.

**30.** The majority finds "incomprehensible" any distinction in an insurer's duty to its insured based upon whether the insurance contract covers first-party losses or third-party losses. Majority op. at 226. Perhaps it might try harder to examine the differences between the two insurer-insured relationships rather than hold fast to a previous uninformed position.

## OTHER AREAS OF DISAGREEMENT

These are other, perhaps more mundane, matters about which I disagree with the majority. These concern the treatment of the questions of Maryland's bad faith and the meaning of the relationship between Maryland and its recording agent.

### Insurer's Bad Faith

My examination of the cases in which an insurer is alleged to have acted in bad faith, whether or not the insurer was found to have acted in bad faith, compels the conclusion that Maryland, in the context of this case, is the most "innocent" of all the insurers who have been alleged to have acted in bad faith. It certainly is the least culpable of the *named* parties to the suit now on appeal.

Maryland knew that the policy issued did not cover the loss for which a claim was made. It knew that outside legal counsel opined that the loss was not covered. Even after it denied the claim, no one, not even its local recording agent, said a word to indicate possible coverage for about two years. When finally, during the course of discovery prior to the trial of this suit, it learned that its recording agent made a clerical error, it conceded that it was bound to the policy that should have been issued but for the clerical error. It admitted liability on that policy for the loss.

The various parties to this suit, other than Maryland, entered into "sweetheart" deals, insulating themselves from any liability, then led Maryland to the Texas judicial system much as a lamb is led to slaughter. Maryland's only guilt in these proceedings is in being financially solvent, or having deep pockets. What is curious about the majority's holding that the evidence supports a finding that Maryland engaged in unfair or deceptive acts and failed to comply with its duty of good faith and fair dealing to Head is that the evidence of wrongful conduct the majority cites to uphold these findings concerns the conduct of Hermes Payne of Gans & Smith. Yet throughout this suit, in pleadings and evidence, Head makes no complaint about Payne's conduct. Of course, Head made its peace with Gans & Smith in 1992, before anyone spoke to Maryland of any wrongful conduct or clerical error.

The majority appropriately notices certain recent Texas Supreme Court decisions bearing on how appellate courts should review findings of bad faith against an insurer. As noted, to establish a bad faith cause of action a plaintiff must show an absence of a reasonable basis for the denial of or the delay in the processing of a claim and must further show that the carrier knew or should have known that fact. *Union Bankers Ins. Co. v. Shelton,* 889 S.W.2d 278, 283 (Tex.1994). In addressing Maryland's challenge to the legal sufficiency of the evidence, we review the record for no evidence of a negative fact; that is, the absence of a reasonable basis for the insurer's denial of the claim or delay in payment of processing. *Lyons v. Millers Casualty Ins. Co. of Texas,* 866 S.W.2d 597, 600 (Tex.1993); *see also National Union Fire Ins. v. Dominguez,* 873 S.W.2d 373, 376 (Tex.1994). After noticing these decisions, the majority scarcely pays them lip service. Its decision goes against the collective grain of these and other Texas Supreme Court decisions over the past few years.

Obviously, Maryland had a reasonable basis for denying Head's claim. The policy it had issued did not cover the claim and, when Maryland sought an opinion from outside legal counsel, it was informed that there was no coverage. In addition, the issuing agent never informed Maryland of any reason that the written policy would not control. Any reasonable person or insurer would have denied the claim under those circumstances.

### Agency Aspects

Any discussion of the law of agency in this appeal is tangential, but nonetheless I address the topic because of the majority's misconstruction of agency principles. The basis for the majority's holding that all which Gans & Smith knew is imputed to Maryland is founded on erroneous notions of agency law.

Initially, it is appropriate to note that Gans & Smith was a local recording agent for Maryland. The majority fails to observe what that means. A local recording agent is,

[A] person or firm engaged in soliciting and writing insurance, being authorized by an insurance company or insurance carrier,

including fidelity and surety companies, to solicit business and to write, sign, execute, and deliver policies of insurance, and to bind companies on insurance risks, and who maintain an office and a record of such business and the transactions which are involved, who collect premiums on such business and otherwise perform the customary duties of a local recording agent representing an insurance carrier in its relation with the public; or a person or firm engaged in soliciting and writing insurance, being authorized by an insurance company or insurance carrier, including fidelity and surety companies, to solicit business, and to forward applications for insurance to the home office of the insurance companies and insurance carriers, where the insurance company's and insurance carrier's general plan of operation in this State provides for the appointment and compensation of agents for insurance and for the execution of policies of insurance by the home office of the insurance company or insurance carrier, or by a supervisory office of such insurance company or insurance carrier, and who maintain an office and a record of such business and the transactions which are involved, and who collect premiums on such business and otherwise qualify and perform the custody duties of a local recording agent representing an insurance carrier in its relation with the public.

TEX.INS.CODE ANN. art. 21.14, § 2(a)(1) (Vernon Supp.1995). The Insurance Code clearly defines a recording agent's duties and powers, yet the majority looks to common-law or general ideas about what it thinks an agent can do. Agency is a fiduciary relation resulting from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act. RESTATEMENT (SECOND) OF AGENCY § 1 (1958). The action is taken on behalf of the principal; the one who acts is the agent. *Id.*

In the relationship of insurer and recording agent enjoyed by Maryland and Gans & Smith, although the latter acts as a type of agent defined by statute, it also acts as an independent contractor. *See* RESTATEMENT (SECOND) OF AGENCY § 2(3) (1958) (indepen-

dent contractor contracts with another to do something for him but not controlled by other nor subject to other's right to control concerning physical conduct in performing the undertaking in question). Typically, an agent like Gans & Smith may be a corporation itself and may be an agent for one or numerous insurance carriers. *See* TEX.INS. CODE ANN. art. 21.07, §§ 1(a), 6 (Vernon Supp.1995).

The majority's general statements concerning recording agents' authority to act provide it with no support for its decision. Its decision traces its formulation to a single Texas Supreme Court decision: *La Sara Grain Co. v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558 (Tex.1984). That case noted that a bank or corporation is bound by knowledge that comes to the agent in the course of the agent's employment. *Id.* at 563. That case does not remotely resemble this. There, the bank required and possessed La Sara's corporate resolution that two signatures were required on any checks cashed. *Id.* Someone obviously altered the signature card, and after La Sara's general manager, Jones, embezzled over $300,000.00 from the company by writing checks on his signature alone, La Sara sued. *Id.* at 561–63. The bank, through its president, admitted that the bank possessed and knew of the corporate resolution. *Id.* at 563. The actual holding on the issue before the Texas Supreme Court was that the evidence at trial supported the trial court's finding that the bank knew that Jones' signature alone was not the authorized signature of La Sara. *Id.*

In *Mercedes,* the agency relationship was a master-servant one. The bank officers and employees were in reality servants of the bank's board of directors. *See* RESTATEMENT (SECOND) OF AGENCY § 2(2) (1958). The difference between the bank officers' and employees' actions and those of Gans & Smith have been observed in a comment under section 2 of the Restatement. The following comment appears:

*Servant contrasted with independent contractor.* The word "servant" is used in contrast with "independent contractor". The latter term includes all persons who

contract to do something for another but who are not servants in doing the work undertaken. An agent who is not a servant is, therefore, an independent contractor when he contracts to act on account of the principal. Thus, a broker who contracts to sell goods for his principal is an independent contractor as distinguished from a servant. Although, under some circumstances, the principal is bound by the broker's unauthorized contracts and representations, the principal is not liable to third persons for tangible harm resulting from his unauthorized physical conduct within the scope of the employment, as the principal would be for similar conduct by a servant; nor does the principal have the duties or immunities of a master towards the broker.

RESTATEMENT (SECOND) OF AGENCY § 2 cmt. b (1958).

The court in *Mercedes* based its position, concerning a bank or corporation being bound by knowledge that comes to its president in the course of employment, on two earlier decisions. One of those involved an agency relationship between a corporate title company and its vice president (master-servant relationship). *See City of Fort Worth v. Pippen,* 439 S.W.2d 660, 665 (Tex.1969) (corporate title company bound by constructive notice of its vice president). The other decision involved a relationship between a corporate oil company and its president (also a master-servant relationship). *See Wellington Oil Co. of Delaware v. Maffi,* 136 Tex. 201, 150 S.W.2d 60, 64 (1941) (corporate oil company bound by facts known by its president).

No rationale in any of these cases provides any suggestion or support for extension of the principles of law found in those cases to a claim against an insurer for bad faith in denying or delaying payment of a claim based upon the actions or inactions of a local recording agent. The majority erroneously applies case law concerning agent/servant cases to this case involving an agent/independent contractor.

In light of the extreme differences in the relationships between those parties in the *Mercedes* case and the parties in this case,

there is no logical reason to extend the rationale of the language in the *Mercedes* opinion to the present case. Certainly no case has ever extended the authority of recording agents to bind their principals—not with regard to any business such agents are statutorily empowered to conduct—as far as today's decision does. This decision is further in contrast with the long line of cases holding that a recording agent has no authority to bind an insurer via statements made after a loss occurs. *Mid–Century Ins. v. H & H Meat Prods.,* 822 S.W.2d 747 (Tex.App.—Corpus Christi 1992, no writ); *accord Royal Globe Ins. Co. v. Bar Consultants, Inc.,* 577 S.W.2d 688, 694–95 (Tex.1979); *State Farm Mut. Auto. Ins. Co. v. Matlock,* 462 S.W.2d 277, 279 (Tex.1970); *Westbrook v. Millers Mut. Fire Ins. Co.,* 374 S.W.2d 248, 249 (Tex.Civ.App.—San Antonio 1963, no writ).

Maryland relies on the *McGuff* decision approving the rule as set out in the Restatement of Torts. *King v. McGuff,* 149 Tex. 432, 234 S.W.2d 403, 405 (1950); RESTATEMENT (SECOND) OF TORTS § 909 (1979). This rule strictly limits when punitive damages can be awarded against a master or principal for an agent's conduct. *McGuff,* 234 S.W.2d at 405. The majority parries the thrust of this rule with a simple statement that recovery here is not dependent on "the rules of common-law negligence, but rather depends on the existence of corporate knowledge." (Majority op. at 229, 230). I am not sure precisely what that statement means, but it does not provide support or authority for the majority's decision. Rather, this case on appeal is more closely akin to the venerable case of *Centennial Mutual Life Association v. Parham,* 80 Tex. 518, 16 S.W. 316 (1891). That case spoke to the knowledge of an agent ordinarily being imputable to his principal. Chief Justice John W. Stayton wrote for the court that:

> It is ordinarily true that a principal is affected with notice of such facts as come to the knowledge of his agent in the course of his business. When an agent, however, ceases to act for his principal in good faith and through collusion with another, desiring through him to cheat and defraud the principal, practically enters into the service

of that other for the purpose of promoting the interest of that person, or the common interest of himself and that other, in fraud of his principal, then the person who so avails himself of the services of such an agent cannot claim that his act or his knowledge in reference to matters to which the fraudulent collusion relates are binding on the person intended to be defrauded. In such a case, the agent *pro hac vice* becomes the agent of the person he collusively serves.

*Id.* 16 S.W. at 319.

In this case, after the Nelson litigation arose and Maryland denied coverage, all of Gans & Smith's actions were in collusion with Nelson, TU, and Head. In fact, Gans & Smith's Payne declined to talk to Maryland about Gans & Smith's role as Maryland's recording agent until it had arranged a collusive deal with the others whereby it could not be held accountable. Payne told Maryland he did not know what he could tell it because Gans & Smith was represented by an attorney in the Nelson suit. Under these circumstances, the majority's holding that Gans & Smith's knowledge is imputed to Maryland as a matter of law is not supported by agency law and is directly refuted by it.

For these reasons, I disagree with the majority's position that Payne's conduct in failing to inform the company of the coverage actually sold was imputed to Maryland.[31] No evidence supports a bad faith finding on the part of Maryland.

I would modify the judgment to allow recovery for the policy limits and costs of defense only. As modified, I would affirm. Under no circumstances should Head be allowed to recover punitive damages, or additional damages, against Maryland.

I disagree with the majority's decision and, insofar as it allows recovery for more than the policy limits and costs of defense, I respectfully dissent.

---

**31.** Even the jury, although denied most of the facts, could see enough to find that any wrongful conduct on the part of Maryland was not committed "knowingly."